June COLAIO, as Administrator of the Estate of Mark J. Colaio, Deceased, Victor J. Colaio, as Administrator of the Estate of Stephen J. Colaio, Deceased, Frank John Aquilino, as Administrator of the Estate of Frank Thomas Aquilino, Deceased, Geraldine Davie, as Administrator of the Estate of Amy O'Doherty, Deceased, Joanne Lovett, as Administrator of the Estate of Brian F. Nunez, Deceased, Nancy N. Pedicini, as Administrator of the Estate of Thomas E. Pedicini, Deceased, and Maria A. Waring, as Administrator of the Estate of James A. Waring, Deceased, on behalf of themselves and all other similarly situated "eligible individuals" under 49 U.S.C. § 40101, Plaintiffs,

v.

Kenneth R. FEINBERG, Special Master of the September 11th Victim Compensation Fund of 2001, John Ashcroft, Attorney General of the United States, and the United States Department of Justice, Defendants.

Donna M. Smith, individually and as Executrix of the Estate of James Gregory Smith, and Jill I. Rosenblum, individually and as Executrix of the Estate of Andrew I. Rosenblum, Plaintiffs,

v.

John Ashcroft, Attorney General, United States Department Of Justice; and Kenneth R. Feinberg, Special Master, September 11th Victim Compensation Fund of 2001, Defendants.

Cheryl Schneider, as the Executrix of the Estate of Ian Schneider, Deceased, Plaintiff,

v.

Kenneth R. Feinberg, John Ashcroft, and Department of Justice, Defendants.

Nos. 03 Civ. 0558(AKH), 03 Civ. 1040(AKH), 03 Civ. 1129(AKH).

United States District Court, S.D. New York.

May 8, 2003.

John F. Cambria, Salans, New York City, for plaintiffs June Colaio, Victor J. Colaio, Frank John Aquilino, Geraldine Davie, JoAnne Lovett, Nancy N. Pedicini, and Maria A. Waring.

Marc S. Moller, Kreindler & Kreindler, New York City, for plaintiffs Donna M. Smith and Jill I. Rosenblum.

Jonathan C. Reiter, Law Firm of Aaron J. Broder & Jonathan C. Reiter, New York City, for plaintiff Cheryl Schneider.

Robert D. McCallum, Jr., Acting Associate Attorney General, with Peter D. Keisler, Shannen W. Coffin, Joseph H. Hunt, Craig M. Blackwell, Chad N. Boudreaux, James B. Comey, United States Attorney, for the Southern District of New York, and Andrew W. Schilling, Assistant United States Attorney, for defendants.

## OPINION AND ORDER DISMISSING COMPLAINTS

HELLERSTEIN, District Judge.

More than 3,000 people died on September 11, 2001 from the terrorist-related aircraft crashes into the World Trade Center towers, the Pentagon, and the field in Shanksville, Pennsylvania. Those who died, in the airplanes and at the crash sites, were rich and poor, young and old, citizens and non-citizens, and in varied professions and occupations, united only in the unlucky coincidence of time and place.

Eleven days later, Congress and the President, reflecting the sentiments of a shocked and grieving nation, enacted the September 11th Victim Compensation Fund of 2001 ("the Fund") to provide compensation to the bereaved. Soon after, pursuant to the enacting legislation, a Special Master of the Fund was appointed, regulations were promulgated, and the Fund began to function. Now, a year-and-a-half later, the deadline by which all

claims must be filed, December 22, 2003, is fast approaching.

Inevitably, interpretive issues have arisen, and lawsuits have been filed. In the three suits involved in this decision, the plaintiffs, who are eligible to file claims with the Victim Compensation Fund but have not yet done so, allege that the regulations promulgated by the Department of Justice and the interpretive policies of the Special Master, Kenneth R. Feinberg, are arbitrary and capricious, violate the Air Transportation Safety and System Stabilization Act, 49 U.S.C. § 40101 ("the Act"), and unconstitutionally discriminate against them. Their central allegation is that the Special Master's proposed awards fail to reflect that many who died in the World Trade Center were earning, and would have continued to earn, much more than the Special Master is prepared to recognize.

All parties have agreed to a procedure that has brought these cases on for accelerated hearing and determination on an agreed record. Having heard the parties, I now deny plaintiffs' motions for summary judgment, and grant defendants' motions for judgment on the pleadings. Fed. R.Civ.P. 12(c), 56.

## I. Background

### A. The September 11th Victim Compensation Fund of 2001

#### i. Statutory Authorization

The events of September 11, 2001 caused Congress to take immediate action to address the financial crisis in the airline industry and the losses suffered by the victims and their families. On September 22, 2001, President Bush signed into law the Air Transportation Safety and System Stabilization Act of 2001, Pub.L. No. 107–42, 115 Stat. 230 (2001) (codified at 49 U.S.C. § 40101). The Act was subsequently amended on November 19, 2001 and Jan. 23, 2002. *See* Pub.L. No. 107–71, 115 Stat. 631 (2001); Pub.L. No. 107–134, 115 Stat. 2435 (2002).

Title IV of the Act, captioned "Victim Compensation," creates the September 11th Victim Compensation Fund of 2001. Section 403 of the Act states that the purpose of Title IV is "to provide compensation to any individual (or relatives of a deceased individual) who was physically injured or killed as a result of the terrorist-related aircraft crashes of September 11, 2001." A Special Master appointed by the Attorney General administers the Fund, *see* Act § 404(a), and his tasks include promulgating rules and regulations for the Fund, generating application forms for claimants, and being the sole decisionmaker with regard to individual compensation awards, *see* Act §§ 404(a), 405(a)(2), 405(b). The claimant may be represented by counsel, present evidence, and exercise "any other due process rights determined appropriate by the Special Master." Act § 405(b)(4). The Special Master's compensation determinations are "final and not subject to judicial review," and must be rendered within 120 days of the filing of the claim. Act § 405(b)(3).

By electing to file a claim with the Fund, a claimant waives all rights to bring a civil action regarding the September 11 crashes, except to recover collateral source obligations or to sue knowing participants in the hijacking conspiracy. *See* Act § 405(c)(3)(B)(i). If victims pursue the litigation route, the amounts they potentially may recover are limited, by section 408 of the Act, to the insurance coverage of the airlines, aircraft manufacturers, airport sponsors, or persons with a property interest in the World Trade Center. The United States District Court for the Southern District of New York is given exclusive jurisdiction over such lawsuits. *See* Act § 408(b)(3).

In order to qualify as an "eligible individual" for compensation from the Fund, the claimant must be a victim or the personal representative of a victim who: (i) was present on one of the hijacked planes or at the World Trade Center (New York, New York), the Pentagon (Arlington, Virginia), or the site of the aircraft crash at Shanksville, Pennsylvania at the time, or in the immediate aftermath, of the terrorist-related aircraft crashes of September 11, 2001; and (ii) suffered physical harm or death as a result of such an air crash. *See* Act § 405(c). Section 405(b)(1) provides that the Special Master shall review submitted claims according to three factors: harm to the claimant, the facts of the claim, and the individual circumstances of the claimant. The Special Master shall determine: "(A) whether the claimant is an eligible individual under subsection (c); (B) with respect to a claimant determined to be an eligible individual—(i) the extent of the harm to the claimant, including any economic and noneconomic losses; and (ii) the amount of compensation to which the claimant is entitled based on the harm to the claimant, the facts of the claim, and the individual circumstances of the claimant." Act § 405(b)(1). The Special Master is to make his award determinations without regard to "negligence or any other theory of liability." Act § 405(b)(2). His awards are not to include amounts for punitive damages and are to be offset by amounts of collateral source compensation the claimant has received or is entitled to receive as a result of the events of September 11. Act §§ 405(b)(5) and (6). The Act makes no mention of dollar limitations on the amount of an individual claimant's compensation award.

A few of the key terms are defined in section 402. "Economic loss" is "any pecuniary loss resulting from harm (including the loss of earnings or other benefits related to employment, medical expense loss, replacement services loss, loss due to death, burial costs, and loss of business or employment opportunities) to the extent recovery for such loss is allowed under applicable State law." Act § 402(7). Section 402(9) defines "noneconomic losses" as "losses for physical and emotional pain, suffering, inconvenience, physical impairment, mental anguish, disfigurement, loss of enjoyment of life, loss of society and companionship, loss of consortium (other than loss of domestic service), hedonic damages, injury to reputation, and all other nonpecuniary losses of any kind or nature."[1] "Collateral source" is defined in section 402(6) as "all collateral sources, including life insurance, pension funds, death benefit programs, and payments by Federal, State, or local governments related to the terrorist-related aircraft crashes of September 11, 2001." The "claimant" is the "individual filing a claim for compensation under section 405(a)(1)." Act § 402(5).

Not all of the key terms contained in the Act are defined. The Act provides that claimants are entitled to compensation awards based on "the facts of the claim, and the individual circumstances of the claimant," as well as on the "extent of harm," a term which includes "any economic and noneconomic losses." Act § 405(b)(1)(B)(ii). However, the Act does not define these two additional criteria—"the facts of the claim" or "the individual circumstances of the claimant."

### ii. Promulgation of Rules, Regulations and Methodologies

On November 5, 2001, the Department of Justice ("DOJ"), through the Attorney

---

**1.** Unlike the statutory definition of "economic loss," the definition of "noneconomic losses" does not refer to state law.

General, published a Notice of Inquiry and Advance Notice of Rulemaking, pursuant to section 407 of the Act. *See* 66 Fed.Reg. 55,901 (Nov. 5, 2001). This Notice of Inquiry initiated the process of rule-making under the Act. Attorney General John Ashcroft appointed defendant Kenneth R. Feinberg to administer the Fund as the Special Master on November 26, 2001, a selection supported by congressional leaders of the two major political parties. On December 21, 2001, the DOJ published its "Interim Final Rule" governing implementation of the Fund. *See* 66 Fed.Reg. 66,274 (Dec. 21, 2001). Accompanying the Interim Final Rule was a "Statement by the Special Master." *Id.* After receiving thousands of comments, the DOJ published its "Final Rule" for implementation of the Fund on March 13, 2002, modifying some provisions in the Interim Final Rule but otherwise leaving the Interim Final Rule in full force as the law governing the administration of the Fund (hereinafter, the "regulations"). *See* 67 Fed.Reg. 11,233 (Mar. 13, 2002) (codified at 28 C.F.R. pt. 104). A "Statement by the Special Master" accompanied the publication of the Final Rule. *Id.*

Pursuant to the regulations and in some respects expanding on them, the Special Master provided a methodology for determining awards. As mandated by 28 C.F.R. § 104.43, the Special Master published schedules, tables, and charts to permit prospective claimants to estimate economic loss determinations for annual incomes up to but not beyond the 98th percentile of individual income in the United States for the year 2000; the tables do not project awards for incomes above the 98th percentile, or $231,000. The award amounts listed in the tables, or "presumed awards," are "based upon indi-

vidual circumstances of the deceased victim, including: the age of the decedent as of September 11, 2001; the number of dependents who survive the decedent; whether the decedent is survived by a spouse; and the amount and nature of the decedent's income for recent years." 28 C.F.R. § 104.43 (2003). In order to determine a decedent's income, an average of the "decedent's salary/income in 1998–2000" is used, with discretion in the Special Master to take other years into account and make evaluations "in a manner that the Special Master deems appropriate." *Id.* As to non-economic losses, the presumed non-economic loss for decedents is $250,000, plus an additional $100,000 for a spouse and each dependent of the deceased victim.[2] 28 C.F.R. § 104.44 (2003). With respect to the "individual circumstances of the claimant," a criterion provided by the Act for compensation awards, the Special Master was authorized to take into consideration "the financial needs or financial resources of the claimant or the victim's dependents and beneficiaries." 28 C.F.R. § 104.41 (2003).

Claimants may choose between two tracks in pursuing awards. Under Track A, the claims evaluator notifies the claimant within 45 days of his or her eligibility and of the amount of the presumed award. 28 C.F.R. § 104.31(b)(1) (2003). The claimant may then either accept the presumed award as the final determination or seek a hearing under 28 C.F.R. § 104.33. Under Track B, the claims evaluator notifies the claimant about eligibility within 45 days, and the claimant then proceeds to a hearing. 28 C.F.R. § 104.31(b)(2) (2003). The Special Master or his designee may adhere to the presumptive award methodology, or modify the award if the claimant

---

**2.** Plaintiffs are critical of, but do not challenge, the amount of non-economic losses provided by the regulation.

presents "extraordinary circumstances not adequately addressed by the presumptive award methodology." *Id.*

The Special Master has adopted additional procedures, not set out in the regulations, but which are contained in a number of documents available to the public.[3] The main document that reflects these procedures, "Explanation of Process for Computing Presumed Economic Loss" (amended on August 27, 2002) ("Explanation of Process"),[4] includes the presumed award charts, outlines the use of post-tax income for determining lost earnings, and sets consumption rates for decedents according to marital status and the number of dependent children.

The methodology established by the Special Master, pursuant to the regulations and his further implementing policies and explanations, are intended to provide a speedy and efficient alternative to normal tort litigation. Through the tables of presumptive awards, those who suffered irreparable loss from the terrorist-related aircraft crashes of September 11, 2001 are enabled to predict the awards for which they are eligible, and which they will be entitled to receive within a 120–day period.[5] They then can decide among three options: 1) to enter the process and accept the presumed award; 2) to obtain a hearing before the Special Master and seek to prove entitlement to a higher amount, also within a relatively short period; or 3) to pursue the normal tort litigation process, with all its risks of contested liability, discovery, lengthy pre-trial and trial proceedings, appellate review, and substantial litigation expense, but with the potential for larger economic recovery.

## B. The Instant Lawsuits

Three lawsuits have been filed against defendants Kenneth R. Feinberg, John Ashcroft, and the Department of Justice. All involve plaintiffs who are legal representatives of people who died in the World Trade Center on September 11, 2001. None of the plaintiffs has submitted a formal claim to the Fund, but several, and perhaps all, have met with the Special Master for the purpose of evaluating what a possible award might be.

In *Colaio v. Feinberg,* 03 Civ. 0558, seven named plaintiffs bring suit as estate administrators on behalf of themselves and a class of similarly situated "eligible individuals." The complaint alleges that the defendants' promulgation and adoption of certain rules, regulations, and methodologies governing the Special Master's administration of the Fund violate Title IV of the Act and are arbitrary and capricious, particularly in four areas: 1) basing economic loss calculations on after-tax earnings; 2) applying arbitrary and unreasonable consumption rates for single decedents; 3) using a base earnings level formula that does not reflect their economic or financial reality, and which does not consider the higher earnings level that claimants anticipated for the year 2001; and 4) failing to compensate economic loss for decedents whose average level earnings exceeded the 98th percentile for individual income ac-

---

3. These documents can be found on the Special Master's website at <http://www.usdoj.gov/victimcompensation>.

4. The most recent Explanation of Process is not contained in the Administrative Record provided by the government, but does appear in the factual record submitted by plaintiff June Colaio at JC0177.

5. Potential claimants can estimate their presumed award by looking at the table that reflects the decedent's marital status and number of children and then locating the amount of the award at the intersection of the decedent's income, which falls along the horizontal axis of the table, and the decedent's age, which falls along the vertical axis. *See* Explanation of Process.

cording to the United States 2000 Census, by imposing a de facto, arbitrary, and unreasonable cap through adoption of an unauthorized and undefined "needs" test. Plaintiffs seek to represent a class of all personal representatives of decedents who died at the World Trade Center site on September 11, 2001.

In *Smith v. Ashcroft*, 03 Civ. 1040, the two plaintiffs are administrators of the estates of people whose annual earnings for the three years prior to their deaths substantially exceeded $231,000. The *Smith* complaint seeks a judgment declaring that 1) the imposition of a "needs" test by the Special Master violates the Act and is arbitrary and capricious; 2) the burden of proof to establish economic loss shall be the same for all claimants, and those claimants whose decedents earned more than $231,000 annually should not be required to meet the heavier burden of "extraordinary circumstances" to obtain an award higher than the maximum presumptive awards; and 3) economic loss shall be based on gross pre-tax income as required by New York state law, rather than post-tax income.

The third case, *Schneider v. Feinberg*, 03 Civ. 1129, involves similar claims as those in *Colaio* and *Smith*. The plaintiff, Cheryl Schneider, sues for a judgment requiring the Special Master 1) to award all claimants their economic losses subject only to reduction for collateral source compensation, without consideration for financial need or proof of extraordinary circumstances, and based on pre-tax earnings of the decedent; 2) to disclose the reports of economic loss created by Price Waterhouse, a firm retained by the Special Master; and 3) to determine the plaintiff's claim in accordance with the evidence of economic loss submitted in compliance with the Fifth Amendment's due process and equal protection guarantees.

Read together, the plaintiffs' complaints challenge numerous aspects of the regulations and the Special Master's interpretive methodologies and policies as violations of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706 (2003):(1) the Special Master's alleged imposition of a cap on awards; (2) the provision that the "individual circumstances of the claimant" "may include the financial needs or financial resources of the claimant or the victim's dependents and beneficiaries," 28 C.F.R. § 104.41; (3) the Special Master's limited application of state law as provided by 28 C.F.R. § 104.42; (4) the publication of a methodology for determining presumed economic loss "up to but not beyond the 98th percentile of individual income in the United States for the year 2000," and the focus on the "Decedent's salary/income in 1998–2000 (or for other years the Special Master deems relevant)" in determining economic loss, 28 C.F.R. § 104.43; (5) the requirement that the claimant present "extraordinary circumstances not adequately addressed by the presumptive award methodology" in order to obtain an adjustment in the presumed award, 28 C.F.R. §§ 104.31(b)(2) and 104.33(f)(2); (6) the Special Master's use of post-tax income as the basis for calculating economic loss; (7) the Special Master's use of a consumption rate for single decedents that is higher than the consumption rate for decedents who were married or had children in determining economic loss; and (8) the alleged violation of equal protection and due process rights in making award determinations.

Shortly after the *Colaio* complaint was filed, I held a conference on February 6, 2003. The parties agreed that no factual issues were in dispute and that the lawsuits could be decided by motion.[6] In order to facilitate appellate review before

---

6. Counsel for the plaintiff in *Schneider*, which had not yet been filed, was not present.

the looming deadlines for filing lawsuits and claims with the Fund,[7] I ordered, with the consent of the parties, the compilation and submission of factual without the customary discovery process, and issued an expedited briefing schedule. I denied the *Colaio* plaintiffs' request to depose the Special Master because of the absence of factual dispute as to any material issue, and because the proceeding was not to be a review of any specific award determination.

Plaintiffs issued subpoenas for two documents: 1) a report created by Price Waterhouse, an accounting firm retained by the Special Master, regarding the economic losses of plaintiff Cheryl Schneider; and 2) a report provided by the Special Master to Cantor Fitzgerald and its counsel Skadden Arps, laying out economic and noneconomic losses for decedents with annual incomes up to $1 million. After hearing the parties, I quashed the subpoena for production of the Price Waterhouse report, because no material issue was presented, but required that the government disclose its contents by category; the government made this disclosure. I ordered the production of the report provided to Cantor Fitzgerald because attorney-client privilege had been waived.

Oral argument on the motions was held on the morning and afternoon of April 14, 2003. I now deliver my decision.

## II. Discussion

Defendants have brought motions to dismiss the complaints under Rule 12(c) of the Federal Rules of Civil Procedure. A court deciding a motion for judgment on the pleadings pursuant to Rule 12(c) must accept as true the allegations of the party opposing the motion. *Rivera v. Heyman*, 157 F.3d 101, 103 (2d Cir.1998). Allegations in the pleadings "should be construed liberally in favor of the plaintiffs." *Ad–Hoc Comm. of Baruch Black & Hispanic Alumni Ass'n v. Bernard M. Baruch Coll.*, 835 F.2d 980, 982 (2d Cir.1987).

Plaintiffs have brought motions for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. Summary judgment may be granted if there are "no genuine issues as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Although all facts and inferences therefrom are to be construed in favor of the party opposing the motion, *Harlen Assocs. v. Village of Mineola*, 273 F.3d 494, 498 (2d Cir.2001), the non-moving party must raise more than just a "metaphysical doubt" as to a material fact, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[M]ere speculation and conjecture is insufficient to preclude the granting of the motion." *Harlen Assocs.*, 273 F.3d at 499.

At oral argument, all parties agreed that no factual disputes exist and that the is-

---

7. Plaintiffs face the upcoming two-year New York statute of limitations for wrongful death suits on September 11, 2003, *see* N.Y. Est. Powers & Trusts Law § 5–4.1 (2003), and the December 22, 2003 deadline for filing claims with the Fund, *see* 28 C.F.R. § 104.62 (2003). The governor and legislature of New York have recently agreed to extend the statute of limitations for wrongful death suits brought by victims of September 11 to March 11, 2004. *See* Alicia Chang, *New York to extend deadline for WTC families to sue*, Newsday, April 9, 2003.

sues presented by the motions may be resolved as a matter of law.

## A. Judicial Review

The government argues that plaintiffs' claims are precluded by the Act. Section 405(b)(3) of the Act provides that the Special Master must, within 120 days after a claim is filed, "complete a review, make a determination, and provide written notice to the claimant, with respect to the matters that were subject of the claim under review. Such a determination shall be final and not subject to judicial review."

However, plaintiffs are not complaining about any final determinations by the Special Master. Indeed, none of the plaintiffs has filed a claim with the Special Master for compensation by the Victim Compensation Fund. Resolution of their complaints would not dictate the precise amount the Special Master must award. *Cf. Heckler v. Ringer,* 466 U.S. 602, 621, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984) (dismissing for lack of jurisdiction because the essence of the complaint was a claim of entitlement to payment for a surgical procedure, a determination reserved for the Secretary of Health and Human Services).

■ Plaintiffs' complaints concern the legality of the regulations promulgated by the Department of Justice and of the interpretive methodologies and policies adopted by the Special Master. Courts begin "with the strong presumption that Congress intends review of administrative action." *Bowen v. Michigan Acad. of Family Physicians,* 476 U.S. 667, 670, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986). "[O]nly upon a showing of 'clear and convincing evidence' of a contrary intent should the courts restrict access to judicial review." *Abbott Labs. v. Gardner,* 387 U.S. 136, 141, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). Courts may review methods used by an agency despite the existence of statutory language prohibiting the review of agency decisions on individual cases. *See McNary v. Haitian Refugee Ctr.,* 498 U.S. 479, 492, 111 S.Ct. 888, 112 L.Ed.2d 1005 (1991) (upholding jurisdiction because the jurisdictional bar applied to direct review of individual denials of status by the agency, rather than to general collateral challenges to unconstitutional practices and policies used by the agency in processing applications). *See also Abdullah v. INS,* 184 F.3d 158, 164 (2d Cir.1999) (construing *McNary* as holding that "a district court may exercise jurisdiction to adjudicate pattern-or-practice claims against the INS, as opposed to individual denials of status adjustment"). Claims that a statutory mandate or constitutional guarantee has been violated, or that the Special Master has exceeded the scope of his delegated authority, are appropriate matters for judicial review. *See Leedom v. Kyne,* 358 U.S. 184, 188, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958). Accordingly, section 405(b)(3) of the Act does not preclude review of the claims presented here.

■ These complaints also pose issues ripe for review. Under the APA, a case is ripe for judicial review if an agency's conduct constitutes a "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. *See Top Choice Distribs., Inc. v. United States Postal Serv.,* 138 F.3d 463, 466 (2d Cir. 1998). The Supreme Court has set forth a two-part test for identifying a final agency action. "First, the action must mark the consummation of the agency's decision-making process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined' or from which 'legal consequences will flow.'" *Bennett v. Spear,* 520 U.S. 154, 177–78, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (citations omitted). *See also Abbott Labs.,* 387 U.S. at 148–49, 87 S.Ct. 1507

(observing that the "problem is best seen in a twofold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration").

Both elements of the Supreme Court's test are met here. First, the regulations and the Special Master's methodologies and policies constitute "definitive positions" on the issues raised by plaintiffs. The regulations and explicit statements published by the Special Master reflect final policies pertaining to the challenged methodologies. Second, the regulations and the Special Master's policy pronouncements inflict "an actual, concrete injury." The choice required of claimants, to elect between applying to the Victim Compensation Fund or filing a lawsuit, must be between two lawful alternatives. Plaintiffs' allegations, that the regulations and methodologies would deprive them unlawfully of compensation, establish an injury sufficient to satisfy the criterion of ripeness. *See Able v. United States,* 88 F.3d 1280, 1290 (2d Cir.1996). Plaintiffs are entitled to judicial resolution of the alleged illegality of the regulations promulgated by the Department of Justice and of the interpretive methodologies and policies adopted by the Special Master.

## B. Challenges to the Congressional Delegation to the Special Master

■ A preliminary question posed in these cases is the nature and scope of the power delegated by Congress to DOJ and the Special Master. The plaintiffs raise two delegation-related challenges. First, they argue that Congress did not delegate to the Special Master the power to prescribe the standards by which awards are determined. They contend that the Special Master was to serve as a quasi-judicial

official responsible for assessing evidence and calculating awards according to criteria defined by Congress; they note that Congress designated the government's department of law, the Department of Justice, rather than its agency for the distribution of public benefits, the Department of Health and Human Services, to administer the Fund. Secondly, they argue that if Congress did bestow the scope of discretion claimed by the Special Master, then such delegation is not guided by any "intelligible principle." [8]

The Act invests the Special Master with considerable discretion. The Special Master is authorized to administer the compensation program, "promulgate all procedural and substantive rules for the administration of this title," and employ and supervise hearing officers and other administrative personnel. Act § 404(a). The Special Master reviews the claim and determines the amount of the award, a finding immune from judicial review. Act § 405. The regulations and the Special Master's methodologies do not exceed the bounds of the congressional delegation, which expressly grant him the power to promulgate procedural and substantive rules to administer the Fund.

■ I also rule that Congress' broad delegation to the Special Master does not raise separation of powers problems. "In a delegation challenge, the constitutional question is whether the statute has delegated legislative power to the agency." *Whitman v. American Trucking Associations,* 531 U.S. 457, 472, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001). It is well established that "Congress does not violate the Constitution merely because it legislates in broad terms, leaving a degree of discretion to executive and judicial actors." *Touby v.*

---

8. While plaintiffs make this nondelegation challenge, they do not seek a ruling invalidating the provisions in the Act which provide for a Special Master, or which give discretion to the Special Master.

*United States,* 500 U.S. 160, 165, 111 S.Ct. 1752, 114 L.Ed.2d 219 (1991). "So long as Congress 'shall lay down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform, such legislative action is not a forbidden delegation of legislative power' ... [T]his Court has deemed it 'constitutionally sufficient if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority.' " *Mistretta v. United States,* 488 U.S. 361, 372–73, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989) (citations omitted). The Supreme Court, having found the requisite "intelligible principle" lacking in only two statutes in its history, has " 'almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law.' " *Whitman,* 531 U.S. at 475, 121 S.Ct. 903 (citations omitted).

Here, the Act provides an "intelligible principle" to guide the Department of Justice and the Special Master. Section 403 states that the Act's purpose is to "provide compensation," and Section 405(b) provides the basic criteria for determining the amount of the award—the harm to the claimant, the facts of the claim, and the individual circumstances of the claimant. Although Congress established factors for the Special Master to consider without specifying the calculation to be used to weigh those factors, "[i]t is not necessary that Congress prescribe a standard that can be applied with mathematical certainty." *Allegheny Airlines, Inc. v. Village of Cedarhurst,* 238 F.2d 812, 816 (2d Cir. 1956). Nor is it necessary "that Congress supply administrative officials with a specific formula for guidance in a field where flexibility and the adaption of congressional policy to infinitely variable conditions constitute the essence of the program." *Lichter v. United States,* 334 U.S. 742, 785,

68 S.Ct. 1294, 92 L.Ed. 1694 (1948). Congress granted the Special Master the degree of discretion necessary and appropriate to evaluate claims on individualized bases to fulfill the congressional policy of providing compensation to the thousands of victims of September 11th. Although plaintiffs may disagree with how the Special Master proposes to exercise his discretion, and perhaps even with Congress' decision to grant him discretion, it cannot be said that the Act fails to provide an "intelligible principle" by which the Special Master shall determine the compensation to be awarded.

## C. Challenges to DOJ's Regulations and the Special Master's Methodologies and Policies

The plaintiffs challenge a number of DOJ's regulations and the Special Master's methodologies and policies. The Act authorized the promulgation of regulations by the Attorney General, in consultation with the Special Master, *see* Act § 407, including "all procedural and substantive rules for the administration of" the Fund, *see* Act § 404(a)(2). Part 104 of title 28 of the Code of Federal Regulations was duly promulgated following the notice and comment process provided by the Administrative Procedure Act. *See* 5 U.S.C. § 553 (2003). The Special Master also adopted methodologies and policies that were not themselves the subject of the notice and comment procedure, but which were intended to implement the Act and the regulations, such as the use of post-tax income and the setting of consumption rates.

In determining whether the agency's interpretation of a statute is lawful, courts apply the two-step *Chevron* analysis: 1) If Congress "has directly spoken to the precise question at issue" in the text of the statute, the text governs; or 2) If the statute is "silent or ambiguous with

respect to the specific issue," then the court reviews "whether the agency's answer is based on a permissible construction of the statute." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Thus, a court must first decide "whether the statute unambiguously forbids the [a]gency's interpretation," and if not, "whether the interpretation, for other reasons, exceeds the bounds of the permissible." *Barnhart v. Walton,* 535 U.S. 212, 218, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002).

The Special Master's policies implementing the Act and the regulations are also entitled to deference, even if they were not themselves subject to notice-and-comment rulemaking. As the Supreme Court held in *United States v. Mead Corp.,* *Chevron* deference may be warranted "even when no such administrative formality was required and none was afforded." 533 U.S. 218, 231, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001). Thus, where "Congress would expect the agency to be able to speak with the force of law when it addresses ambiguity in the statute or fills a space in the enacted law, even one about which 'Congress did not actually have an intent' as to a particular result," courts should confer *Chevron* deference. *Mead Corp.,* 533 U.S. at 229, 121 S.Ct. 2164 (quoting *Chevron,* 467 U.S. at 845, 104 S.Ct. 2778). Even if *Chevron* does not apply, interpretations contained in formats such as policy statements, agency manuals, guidelines, and opinion letters are still "entitled to respect" and may "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944). *See also Christensen v. Harris Cty.,* 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000). "The weight of [the agency's] judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore,* 323 U.S. at 140, 65 S.Ct. 161. This deference is justified by the "specialized experience and broader investigations and information available to the agency, and given the value of uniformity in its administrative and judicial understandings of what a national law requires." *Mead Corp.,* 533 U.S. at 234, 121 S.Ct. 2164 (citations omitted).

Two recent Supreme Court cases, *Christensen* and *Mead Corp.,* illustrate the application of this doctrine. In *Mead Corp.,* the Supreme Court held that a tariff classification ruling by the United States Customs Service—which did not follow notice and comment—was not entitled to *Chevron* deference, because the statute authorizing the Customs Service to fix tariff classifications did not indicate that these classification rulings would carry the force of law; the rulings would not necessarily bind more than the parties involved, and every ruling would be subject to independent review by the Court of International Trade. *Mead Corp.,* 533 U.S. at 231–32, 121 S.Ct. 2164. However, the Court remanded the case for further proceedings to determine whether the tariff ruling was entitled to respect under *Skidmore,* noting that the regulatory scheme for tariffs was highly detailed and the Customs Service could bring the benefit of specialized experience. *See id.* at 235, 121 S.Ct. 2164. In *Christensen v. Harris County,* the Supreme Court refused to defer to the Department of Labor's opinion letter, which interpreted the Fair Labor Standards Act as barring employers from forcing employees to use compensatory time accrued for overtime work. 529 U.S. at 576, 120 S.Ct. 1655. The Court concluded that the agency's interpretation of the statute was unpersua-

sive, because both the statutory language and the regulation in question permitted compelled compensatory time. *See id.* at 586–88, 120 S.Ct. 1655.

The Special Master's policies qualify for *Chevron* deference or, at a minimum, *Skidmore* respect. Unlike the interpretations at issue in *Mead Corp.*, the Special Master's policies bind all claimants to the Fund, and his final award determinations cannot be reviewed by any court. And unlike the *Christensen* opinion letter, and as discussed in further detail below, the Special Master's policies do not contradict the Act or its regulations, are supported by evidence and valid reasoning, and are persuasive as carrying out congressional intent.

 Section 706(2) of the APA provides that final agency action, findings, and conclusions may be set aside only if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2003). "The scope of review under this provision of the APA is a 'narrow one.'" *City of New York v. Shalala*, 34 F.3d 1161, 1167 (2d Cir.1994) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)). The court may neither "weigh alternatives available to the agency and then determine which is the more reasonable," *Soler v. G. & U., Inc.*, 833 F.2d 1104, 1107 (2d Cir. 1987) (citations omitted), nor "substitute its judgment for that of the agency," *Overton Park*, 401 U.S. at 416, 91 S.Ct. 814. Plaintiffs must "clearly demonstrate" that the agency (or Special Master) "'relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem [or] offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Soler*, 833 F.2d at 1107 (citations omitted). The arbitrary and capricious standard, while deferential, does not give agencies completely free rein. "[A] reviewing court must be certain that an agency has considered all the important aspects of the issue and articulated a 'satisfactory explanation for its action, including a rational connection between the facts found and the choice made.'" *Henley v. FDA*, 77 F.3d 616, 620 (2d Cir.1996) (citations omitted).

In the analysis that follows, I review the plaintiffs' challenges to specific DOJ regulations and Special Master policies. The standards articulated under the APA and in *Chevron* and *Skidmore* govern my review.

*i. Challenge to Special Master's Imposition of a "De Facto" Cap on Awards*

 The plaintiffs' central complaint is that the Special Master has imposed a de facto cap on awards with respect to those whose income exceeded the 98th percentile. The defendants, conceding that a cap would be impermissible, deny that the Special Master has imposed, or will impose, a cap.[9] In his Statement to the Final Rule, the Special Master stated: "Although we still anticipate that awards in excess of $3 or $4 million will be rare, we emphasize again that there are no 'caps' under this program. To the contrary, each claimant has the option to ask for a

---

9. The legislative history shows that Congress considered a cap on Fund awards, but none was ultimately adopted. *See* 147 Cong. Rec. H5892 (Sept. 21, 2001) (statement by Rep. Spratt) ("I do think the compensation to which they are entitled under this bill should be subject to some fair and reasonable limit"); *id.* at H5984 (statement by Rep. Gephardt) (noting that the bill "does not cap the damages these families who have lost so much can possibly get").

hearing at which he or she may assert additional individualized circumstances and argue that the presumed award methodology is inadequate to resolve his or her particular claim in a fair manner." Statement by Special Master, 67 Fed.Reg. 11,233, 11,234 (Mar. 13, 2002).

The plaintiffs have adduced no reliable evidence that the Special Master has imposed a cap. The awards distributed thus far for deceased victims have ranged from $250,000 to $6,025,931.99. There is no basis to believe that $6 million will be the maximum award if the facts and circumstances merit a higher award, and I note that, according to statistics available on the Fund website, a significant number of the awards have exceeded $3 million.

Plaintiffs complain that the Special Master has implemented the equivalent of a "de facto" cap by considering needs and resources as part of the "individual circumstances" of a claimant, refusing to publish presumptive award amounts in cases where decedents' income exceeded $231,000, and requiring claimants seeking compensation based on loss of considerably higher earnings, in some cases ten times that figure, to establish "extraordinary circumstances" to receive awards exceeding the presumptive award charts. Plaintiffs' arguments concede the absence of a fixed, pre-determined cap on recoveries. As the following discussion shows, the procedures required by the regulations and by the Special Master fairly implement the Act, are entitled to judicial respect, and do not infringe on plaintiffs' constitutional and statutory rights.

### ii. Challenge to 28 C.F.R. § 104.41

Plaintiffs challenge 28 C.F.R. § 104.41, which provides that the "individual circumstances of the claimant may include the financial needs or financial resources of the claimant or the victim's dependents and beneficiaries." They argue that imposition of a "needs" test contradicts the Act, and can be used only to increase the amounts of awards, not to decrease them. The regulation, 28 C.F.R. § 104.41, is a reasonable interpretation of the Act and is entitled to deference under *Chevron*.

Section 405(b) of the Act establishes a three-part inquiry that the Special Master must follow in making award determinations. First, the Special Master must determine whether a claimant is an eligible individual. Act § 405(b)(1)(A). Secondly, the Special Master must determine "the extent of the harm to the claimant, including any economic and noneconomic losses." Act § 405(b)(1)(B)(i). Lastly, the Special Master determines "the amount of compensation to which the claimant is entitled based on the harm to the claimant, the facts of the claim, and the individual circumstances of the claimant." Act § 405(b)(1)(B)(ii).

Under the first step of the *Chevron* analysis, I must examine whether Congress "has directly spoken to the precise question at issue" in the text of the statute. *Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778. Although the statute neither explicitly prohibits nor authorizes the Special Master to consider need in making awards, it suggests such a criterion by the phrase "individual circumstances of the claimant," Act § 405(b)(1)(B)(ii). Because the statute is at least "silent or ambiguous with respect to the specific issue," I must then analyze "whether the agency's answer is based on a permissible construction of the statute." *Id.* Clearly, Congress contemplated that awards would not be equal to the sum of economic and noneconomic losses, for the Act requires the Special Master to award compensation based also on the facts of the claim and the individual circumstances of the claimant. The agency's definition of "individual circumstances" to "include the financial needs or financial resources of the claimant or the

victim's dependents and beneficiaries," 28 C.F.R. § 104.41, is a plausible and reasonable construction of the phrase and does not conflict with any expressed congressional intent.

The plaintiffs assert that "individual circumstances" may be applied only to raise the amount of an award beyond the sum of a claimant's economic and noneconomic losses, not to lower it. This interpretation lacks support in the statute. Section 405(b)(1)(B)(ii) provides that awards of compensation should be "based on" a weighing of three factors, but does not provide how they should be weighed. Nothing in the Act suggests that "individual circumstances" may operate only to increase awards that might otherwise be given. The regulations provide a reasonable and permissible interpretation of the statutory criterion, and a court must give deference to such an interpretation.

Plaintiffs also argue that, for those with incomes above the 98th percentile, the Special Master has interpreted "individual circumstances" such that it overwhelms the other two factors—harm and the facts of the claim—and injects unpredictability in the awards process. They point, for example, to the Special Master's statement attached to the Interim Final Rule, where he cautioned that "a claimant should not assume that he or she will receive an award greater than the presumed award simply because the victim had an income that exceeded the income for the 98th percentile," because "the individual circumstances of the wealthiest and highest-income claimants will often indicate that multi-million dollar awards out of the public coffers are not necessary to provide them a strong economic foundation from which to rebuild their lives." 66 Fed.Reg. 66,274, 66,278 (Dec. 21, 2001). For those with incomes above the 98th percentile, the Special Master stated that they may "ac-

cept awards at the 98th percentile or seek calculation of an award based upon a more detailed record." 67 Fed.Reg. 11,233, 11,-237 (Mar. 13, 2002).

The Special Master's interpretive statements fairly implement both the Act and the regulations, particularly the criterion of "financial needs and financial resources" of 28 C.F.R. § 104.41; they are reasonable, they reflect the Special Master's deep and extensive experience in mass tort litigation, and they are entitled to respect under *Skidmore*. The Special Master's statements fairly represent the intent of Congress, as expressed in the legislative history of the Act. Congress created the Fund, two weeks after September 11, for "ensuring the victims of September 11 get the assistance they need as they rebuild their lives." 147 Cong. Rec. H5884 (Sept. 21, 2001) (statement of Rep. Frost). Senator Leahy observed that "[t]his program is targeted to help the neediest victims and their families." 147 Cong. Rec. S9599 (Sept. 21, 2001). Senator McCain commented:

No amount of money can begin to compensate the victims for their suffering. Nothing will make them and their families "whole." It is not the intent of the federal fund to do this. Nor is it the intent of the fund to duplicate the arbitrary, wildly divergent awards that sometimes come from our deeply flawed tort system-awards from which up to one third or more of the victims' award is often taken by attorneys.

The intent of the fund is to ensure that the victims of this unprecedented, unforeseeable, and horrific event, and their families do not suffer financial hardship in addition to the terrible hardships they already have been forced to endure.

147 Cong. Rec. S9594 (Sept. 21, 2001).[10] The Special Master appropriately consid-

---

**10.** Statements by Senators following the passage of the Act and submitted as part of the

ered Congress' conception of the Fund as addressing the needs and hardships of the victims of September 11 when formulating a definition of "individual circumstances" that includes financial needs and resources.

Congress believed that the Fund would provide compensation as an alternative to the tort system, and to individuals who might not be able to recover anything through litigation, notwithstanding years of effort, expense, and emotional toil. As Senator John McCain said, the "victims could also receive no compensation from the courts if they determine that corporate entities, including airlines, were not responsible for the devastating damage arising from the terrorist attacks." 147 Cong. Rec. S9594 (Sept. 21, 2001). He explained that the Fund would "ensure that the victims and families of victims who were physically injured or killed on September 11th are compensated even if courts determine that the airlines and any other potential corporate defendants are not liable for the harm; if insurance monies are exhausted; or are consumed by massive punitive damage awards or attorneys' fees." *Id. See also* 147 Cong. Rec. H5892 (Sept. 21, 2001) (statement of Rep. Spratt) ("in this case . . . the liability of the airlines is unsettled"). The Fund was not intended to replicate tort damage awards in wrongful death actions.

Congress invested the Department of Justice and the Special Master with discre-

tion to decide how to account for the "individual circumstances of the claimant" and the "facts of the claim," and how much weight to give those factors in determining the amount of compensation. It is entirely appropriate for Congress to vest agencies with such discretion in carrying out broadly-defined statutory duties. *See, e.g., Secretary of Agric. v. Central Roig Refining Co.,* 338 U.S. 604, 611, 70 S.Ct. 403, 94 L.Ed. 381 (1950) (where statutory factors agency is required to consider are not "mechanical or self-defining standards," they "in turn imply wide areas of judgment and therefore of discretion"); *Florida Manufactured Hous. Ass'n, Inc. v. Cisneros,* 53 F.3d 1565, 1577 (11th Cir. 1995) ("[a]s long as the agency gives fair consideration to the relevant factors mandated by law, the importance and weight to be ascribed to those factors is the type of judgment that courts are not in a position to make. Instead, that judgment is for the agency"); *State of New York v. Reilly,* 969 F.2d 1147, 1150 (D.C.Cir.1992) ("[b]ecause Congress did not assign the specific weight the Administrator [of the EPA] should accord each of these factors [relating to limiting harmful emissions], the Administrator is free to exercise his discretion in this area"). The flexibility given to the Special Master in determining how much weight each factor shall have is appropriate to the task Congress intended that he should carry out.

notice-and-comment procedure confirm this interpretation. In a letter dated December 17, 2001, Senator Don Nickles said: "I urge you to keep in mind that the Fund was created by Congress as a unique federal response to a situation where normal litigation may have left victims without recovery. The Fund should be administered with both the needs of the victims and taxpayers in mind and with recognition of the impressive charitable reaction of the American people." (R. at VCF111–1332.) Senator Orrin Hatch echoed this sentiment in his comment dated Novem-

ber 20, 2001: "We must remember that the resources of the American taxpayer are not unlimited and truly they have responded very generously to these horrible events. It would be wrong to take undue advantage of their generosity by increasing their burden exponentially beyond the defined parameters of the fund. As we all know, the fund was not created to give a windfall to these tragic victims, but rather to assist them in their time of need to get through the loss suffered at the hands of these terrorists." (R. at VCF110–0073.)

As will be discussed in more detail in Part II.C.iv. below, those with incomes above the 98th percentile enter the claims process with the knowledge that they will receive awards at least at the 98th percentile level, and if they prove "extraordinary circumstances," beyond that level. The system does not force them to enter the Fund without any sense of what they will receive. The plaintiffs do not complain that they are unsure what is meant by the terms needs, resources, or individual circumstances, but that they are unhappy with the Special Master's discretion beyond the 98th percentile level to determine awards according to the claimant's needs, resources, and other individual circumstances. That, however, is discretion that Congress wanted the Special Master to have.

### iii. Challenge to 28 C.F.R. § 104.42

■ Plaintiffs challenge the validity of 28 C.F.R. § 104.42. Section 402(7) of the Act defines the term "economic loss" as "any pecuniary loss resulting from harm (including the loss of earnings or other benefits related to employment, medical expense loss, replacement services loss, loss due to death, burial costs, and loss of business or employment opportunities) to the extent recovery for such loss is allowed under applicable State law." 28 C.F.R. § 104.42 interprets the phrase "to the extent recovery for such loss is allowed under applicable state law" as meaning that "the Special Master is not permitted to compensate claimants for those categories or types of economic losses that would not be compensable under the law of the state that would be applicable to any tort claims brought by or on behalf of the victim." Plaintiffs argue that this regulation is improperly restrictive as to how state law should be applied. Specifically, they assert that because the law of New York requires use of pre-tax earnings in computation of loss in wrongful death actions and

individualized determinations of personal consumption rates, and because the law of New York does not require that income be averaged or impose a needs test, the regulations and policies providing for the application of post-tax earnings, standardized personal consumption rates, averaged income, and a needs test violate the statute.

Under the first step of the *Chevron* analysis, I must determine whether the statutory language is ambiguous. Plaintiffs contend that the phrase "to the extent recovery is allowed under applicable state law" is clear and should be interpreted like a similar phrase in the Federal Tort Claims Act ("FTCA"), which provides that the "United States shall be liable ... to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. In *Richards v. United States*, the Supreme Court, construing this language, held that the FTCA incorporates the "whole law" of the state in which the act or omission occurred. 369 U.S. 1, 11, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962).

But the phrases are not the same, and the statutory purposes are not the same. Congress, in passing the Air Transportation Safety and System Stabilization Act, and in creating the Fund, was concerned with implementing a methodology of compensation without concern for fault—a methodology that would not simply mirror what an income-earner might have provided but for his or her death at the hands of terrorists, but with respect to many other considerations. The Act did not mandate that some advantages to *plaintiffs* existing in particular state laws should be reflected in compensation awards to *claimants*.

The interpretation by 28 C.F.R. § 104.42 of section 402(7) of the Act is permissible and reasonable. First, the text of section 402(7), on its face, refers to the types or categories of losses available under state law, and does not deal with the

calculation of those damages. It defines "economic loss" by reference to a non-exhaustive list of six particular categories of losses. The phrase "such loss" in "to the extent recovery for such loss is allowed under applicable state law" may be read as a limiting phrase referring to the enumerated categories of losses and to any other, unspecified categories of "economic loss." Under this reading, state law defines which of the categories of loss listed in section 402(7)—the loss of earnings, medical expense loss, replacement services loss, loss due to death, burial costs, and loss of business or employment opportunities, as well as any other loss—can be recovered as part of the economic loss determination.

Secondly, the structure of Title IV supports the agency's interpretation. The statutory guidance regarding calculation of compensation awarded under the Fund is provided in Section 405(b), not in Section 402. Section 405(b) specifically addresses the manner in which the Special Master must determine an award of compensation. Section 405(b)(1)(B) broadly outlines the steps the Special Master must take to determine the award, and sections 405(b)(5) and (6) require the Special Master to exclude punitive damages in the computation of the award and deduct collateral source compensation. Section 402, in contrast, is the "definitions" section of the statute. The agency's construction of section 402 as further defining the categories or types of economic loss recoverable is consistent with the purpose of that section in furnishing definitions, rather than the methods for calculating award amounts.

Plaintiffs' argument proposes that the Special Master's determination of compensation should replicate a jury's potential calculation of damages recoverable under New York's wrongful death law. Nothing in the Act supports such an interpretation. Congress did not instruct the Special Mas-

ter to engage in the intricate calculations mandated by state tort law in crafting awards, and did not seek to replace uniformity of application of the congressionally mandated factors with the varying and frequently inconsistent rules applied by states to calculate wrongful death damages. The interests of consistency and uniformity would suffer if state law—the choice of which could turn on factors such as the residency of the decedents, the location of the crashes, and the origins and destination of the planes—were allowed to govern the myriad calculations involved in formulating an award. No evidence exists to support the conclusion that Congress intended to impose such a burden on the Special Master and to cause disparities among similarly situated claimants.

Because section 402(7) is ambiguous, and because the government's reading "is based on a permissible construction of the statute," *Chevron*, 467 U.S. at 843, 104 S.Ct. 2778, I must accord deference to the agency's interpretation of the statutory text under step two of *Chevron*. Nor is such an interpretation arbitrary and capricious for it is supported by the text of the provision and the structure of Title IV as a whole. Accordingly, I hold that the Special Master need not apply state law in making awards, except as state law may preclude a category of recovery.

### iv. Challenge to 28 C.F.R. § 104.43

 Plaintiffs challenge two aspects of 28 C.F.R. § 104.43. The regulation requires the Special Master to develop a methodology for determining presumed economic loss "up to but not beyond the 98th percentile of individual income in the United States for the year 2000." 28 C.F.R. § 104.43 (2003). They argue that the Special Master's failure to calculate or promulgate rules for economic loss where decedents' income exceeded the 98th per-

centile is arbitrary and capricious, because he has prevented potential claimants from making informed decisions as to whether to file Fund applications or pursue judicial remedies and because his failure to publish presumptive economic and noneconomic losses for this group of claimants masks a de facto cap on awards. Plaintiffs also dispute the provision in section 104.43 which bases the calculation of economic loss on the "Decedent's salary/income in 1998–2000 (or for other years the Special Master deems relevant)," 28 C.F.R § 104.43, arguing that the Special Master undervalues economic loss by disregarding 2001 annualized earnings and excluding compensation other than salary and bonus in awards.

Both of the challenged provisions of section 104.43 are entitled to *Chevron* deference. They are not inconsistent with any provision of the Act, and they provide reasonable implementation of the statutory factors that the Act provides. As the Special Master explained, in a statement accompanying the regulations, the determination to provide presumed determinations "up to but not beyond the 98th percentile" was based on a number of factors:

> To be absolutely clear: The fact that the 'presumed awards' address incomes only up to the 98th percentile does *not* indicate that awards from the Fund are 'capped' at that level. In extending the presumed awards only up to the 98th percentile, we merely recognized that calculation of awards for many victims with extraordinary incomes beyond the 98th percentile could be a highly speculative exercise and that, moreover, providing compensation above that level would rarely be necessary to ensure that

the financial needs of a claimant are met. Calculation of an award beyond that point using the presumed award methodology without a detailed record could very well produce inappropriate results. Accordingly, we permitted applicants with extraordinary prior earnings to accept awards at the 98th percentile or seek calculation of an award based upon a more detailed record.

67 Fed.Reg. 11,233, 11,237 (Mar. 13, 2002) (emphasis in original).

The use of the presumed award methodology is consistent with the Act and reasonable. Calculating presumed economic loss requires the Special Master to make a prediction about each claimant's likely future income—a prediction that necessarily involves some degree of speculation. Accurate forecasting of future income streams is more readily accomplished for low- and middle-income employees than for decedents who have experienced relatively high incomes, and plaintiffs concede the problem.[11] As Judge Henry J. Friendly has explained, "in sharp contrast to the great mass of litigation at the lower and middle reach of the income scale, where future income is fairly predictable," the "projection of future income at [higher] levels" of earnings is "itself extremely conjectural." *McWeeney v. New York, New Haven & Hartford R.R. Co.*, 282 F.2d 34, 39 (2d Cir.1960) (en banc), *overruled on other grounds, Norfolk & Western Railway Co. v. Liepelt*, 444 U.S. 490, 494, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980). The Special Master's methodology adopts this principle, concluding that "projecting earnings over worklife for people with extraordi-

---

**11.** In a supplemental letter submitted on April 24, 2003, plaintiffs acknowledge that "as the numbers get higher, the degree of scrutiny and the standard of proof are likely to increase, and that the Special Master is *not*

obligated to simply accept a claimant's (or his/her expert's) mathematical calculation of a future earnings stream" (emphasis in original).

nary annual incomes is a very complex exercise, often requiring a detailed evaluation of variable and often complex formulae for nonvariable income, differing work life expectations, often highly volatile industries or markets and other factors that are not often subject to easy generalization." Statement by the Special Master, 66 Fed.Reg. 66,274, 66,278 (Dec. 21, 2001). The defendants also note that attempts to apply the "presumed award" methodology to extraordinary incomes might necessitate that the methodology itself be reconsidered, because it incorporates assumptions about growth, consumption and other factors that would be inappropriate if mechanically applied to the highest level incomes. Even if a wealthy decedent's future income could be projected with certainty, the amount of a decedent's contribution to the support of surviving family members becomes more uncertain, especially when the family members are financially secure. *See, e.g., Franchell v. Sims,* 73 A.D.2d 1, 424 N.Y.S.2d 959, 963 (N.Y.App.Div.1980) (extent of financial dependency of beneficiaries is relevant in determining amount of damages); *Breckir v. Lewis,* 21 A.D.2d 546, 251 N.Y.S.2d 77, 80 (N.Y.App.Div. 1964) (damage award for wrongful death of daughter was excessive considering surviving parents' "comfortable circumstances," since daughter may not have contributed to her parents after marriage), *aff'd,* 15 N.Y.2d 1027, 260 N.Y.S.2d 178, 207 N.E.2d 865 (1965). Given the inherently speculative nature of predicting both future income and economic loss for victims whose incomes are in the highest brackets, the regulations are reasonable to the extent that they decline to calculate presumed economic loss for incomes beyond the 98th percentile, and leave the issue to hearings and fact-finding.

Nothing in the regulations prohibits final determinations in excess of the 98th percentile threshold. Thus, under the Fund's two-track system for determining awards, the survivors of individuals with incomes in excess of the 98th percentile have a choice: either they may accept a presumed award at the 98th percentile level, or they may opt for an individual hearing, at which they may present evidence of their higher earnings and any other evidence they believe relevant to the Special Master's determination. 28 C.F.R. §§ 104.31(b)(1), (2), 104.33 (2003). The Special Master may then modify or vary the presumed award if he determines that "the claimant presents extraordinary circumstances not adequately addressed by the presumptive award methodology." 28 C.F.R. §§ 104.31(b)(2), 104.33(f)(2) (2003).

The provision basing the measure of annual income on the average income from 1998–2000 is also reasonable. First, I note that the regulations expressly allow the Special Master to "consider income from other periods that he deems appropriate." 28 C.F.R. § 104.43 (2003). If some claimants would benefit from the use of a different year or years to determine average earnings, they have the opportunity to demonstrate at a hearing that the use of a different year or years is more appropriate. The provision in the regulation to base annual income calculations on the 1998–2000 average income is not arbitrary or capricious. Three-year income averaging tends to level income fluctuations, providing a more accurate projection of a person's future income. Because the attacks occurred in the year 2001, the use of the three-year period from 1998–2000 permits the determination of average annual earnings on the basis of objective evidence, with less need to extrapolate or speculate. I therefore uphold 28 C.F.R. § 104.43.

 *v. Challenge to 28 C.F.R. §§ 104.31(b)(2) and 104.33(f)(2)*

 ■ Plaintiffs object to 28 C.F.R. §§ 104.31(b)(2) and 104.33(f)(2), which au-

thorize the Special Master to adjust a presumed award if "the claimant presents extraordinary circumstances not adequately addressed by the presumptive award methodology." They argue that in cases where decedents' incomes exceeded the 98th percentile, claimants are faced with an untenable choice—either to accept the presumed award keyed to income at the 98th percentile, or to bear the burden of proving "extraordinary circumstances."

■ The "extraordinary circumstances" standard is a valid exercise of the agency's statutory discretion to establish rules governing the determination of compensation. The Act expressly permits the Department of Justice and the Special Master to promulgate "procedural and substantive rules" with respect to "procedures for hearing and the presentation of evidence" on claims and "procedures to assist an individual in filing and pursuing claims." Act §§ 404(a)(2), 407. Federal agencies granted authority to establish rules of procedure for use in rendering individualized decisions may establish and rely upon "reasonable presumptions and generic rules." *Reno v. Flores*, 507 U.S. 292, 313, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993). *See Heckler v. Campbell*, 461 U.S. 458, 467, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983); *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 544, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978) (recognizing "the very basic tenet of administrative law that agencies should be free to fashion their own rules of procedure").

■ Under the Act's delegation of authority, the defendants had wide discretion to establish substantive evidentiary burdens by which claimants would satisfy their entitlement to compensation from public funds. *See Heckler*, 461 U.S. at 466–67, 103 S.Ct. 1952 (where statute authorized agency to adopt regulations "for the nature and extent of the proofs and evidence and the method of taking and furnishing same" in disability cases, the agency may establish vocational guidelines). *See also Mobil Oil Exploration & Producing Southeast Inc. v. United Distrib. Cos.*, 498 U.S. 211, 228, 111 S.Ct. 615, 112 L.Ed.2d 636 (1991) (observing that "[t]ime and again, the [Supreme] Court has recognized that even where an agency's enabling statute expressly requires it to hold a hearing, the agency may rely on its rulemaking authority to determine issues that do not require case-by-case consideration") (internal citations and quotation omitted). The general authority to establish procedures for administrative proceedings may encompass not only the promulgation of rules but also creation of exceptions to those rules, including an "extraordinary circumstances" exception. *See American Hosp. Ass'n v. NLRB*, 499 U.S. 606, 609–610, 111 S.Ct. 1539, 113 L.Ed.2d 675 (1991) (statutory authority to establish regulations "necessary to carry out the provisions" of National Labor Relations Act was sufficient to authorize "extraordinary circumstances" exception). *See also Flores*, 507 U.S. at 313, 113 S.Ct. 1439 (upholding INS regulations establishing "presumptively appropriate" custodians for juveniles in INS custody and granting INS directors discretion to depart from presumptive rule in "unusual and compelling circumstances").

The Special Master and the DOJ, in exercising their discretion, concluded that a claimant must demonstrate extraordinary circumstances to depart from a presumed award. Such a conclusion is not arbitrary or capricious. As discussed earlier, the Special Master permissibly created presumed award charts for those with incomes up to the 98th percentile that account both for economic and noneconomic losses and for needs and resources. Given the Special Master's assurance that "[t]he term 'extraordinary circumstances'

is not intended to signal that there is an unsustainable burden to justify departure from the presumed award," creating a system where the "presumed award methodology should be fair and appropriate for a substantial majority of claims" and where those above the 98th percentile must demonstrate "extraordinary circumstances" is both permissible and reasonable. Statement by the Special Master, 67 Fed.Reg. 11,233, 11,244 (Mar. 13, 2002).

### vi. Challenge to Use of Post–Tax Earnings as Basis for Economic Loss

■ Plaintiffs argue that the Special Master's method of calculating presumed economic loss on the basis of net, after-tax earnings is arbitrary and capricious and contrary to New York state law, which determines loss on the basis of gross, pre-tax earnings. However, the Act does not compel the Special Master to follow state law in determining the amount of loss, but only in identifying categories of compensable economic loss. I hold that the Special Master's use of net, after-tax income is not arbitrary and capricious, and is reasonable and entitled to respect as a proper implementation of congressional intent.

Plaintiffs must recognize that claimants would not have the benefit of earnings and other compensation that would have been taxed had the decedent lived. Furthermore, the awards payable to claimants will not be taxed under the tax relief law passed in January 2002. *See* Victims of Terrorism Tax Relief § 101, 26 U.S.C. § 692 (2003). As the Supreme Court has ruled, it is the decedent's "after-tax income, rather than his gross income before taxes, that provides the only realistic measure of his ability to support his family." *Norfolk & Western Ry. Co. v. Liepelt,* 444 U.S. 490, 493–94, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980) (emphasis added). "It follows inexorably that the wage earner's income tax is a relevant factor in calculating the

monetary loss suffered by his dependents when he dies." *Id.* While New York state may follow a different rule for wrongful death actions, the Special Master's use of after-tax income to calculate economic loss is rational and fully consistent with the purposes of the Act.

The Administrative Record submitted in this action contains an adequate basis to support the Special Master's decision-making. *See Sierra Club v. U.S. Army Corps of Engineers,* 772 F.2d 1043, 1051 (2d Cir. 1985) (court "will uphold a decision of less than ideal clarity where the 'path which [the agency] followed can be discerned' ") (quoting *Colorado Interstate Gas Co. v. FPC,* 324 U.S. 581, 595, 65 S.Ct. 829, 89 L.Ed. 1206 (1945)). During the notice and comment period, the Special Master received numerous comments regarding the use of post-tax income. His Statement accompanying the Final Rule addresses these comments, *see* 67 Fed.Reg. 11,233, 11,238 (Mar. 13, 2002), and the Explanation of Process describes in detail how income taxes are taken into consideration in the calculation of presumed economic loss.

### vii. Challenge to Consumption Rate for Single Decedents

■ Plaintiffs also challenge the consumption rates used in the Special Master's methodology. First, plaintiffs assert that no rational basis exists to use different consumption rates for single decedents without dependents than for married decedents or single decedents with dependents. Second, plaintiffs argue that the degree to which consumption rates for single decedents exceeds that for other decedents is arbitrary and capricious.

The defendants have pointed to expert studies contained in the Administrative Record and cited by the Explanation of Process to support its use of different con-

sumption rates. The record includes tables from the Bureau of Labor Statistics' Consumer Expenditure Survey (R. at VCF100–0373) and the "Patton–Nelson Personal Consumption Tables (1997–98 Update)" from the Journal of Forensic Economics (R. at VCF100–0371–2). The Patton–Nelson tables confirm that forensic economists use different and substantially higher personal consumption rates for single-member households than for households with more than one person when calculating losses in wrongful death or survival actions.

Plaintiffs contend that no rational basis exists for the inclusion of the expenditure category for "Housing, Education, and Health" when calculating consumption rates for single decedents but not when calculating consumption rates for other decedents. However, expert evidence considered by the Special Master supports treating different expenditure categories differently depending upon the number of household members. *See* Explanation of Process at 3 (citing R. Patton & D. Nelson, Estimating Personal Consumption Costs in Wrongful Death Cases, Journal of Forensic Economics, at 236–39 (1991) (suggesting different treatment of certain expenditure categories, including categories for "housing," "education," and "health," depending upon whether household consists of one person or more than one person)). Because a rational basis exists in the Administrative Record and expert literature to support the Special Master's treatment

of different expenditure categories, plaintiffs' challenge to the Special Master's methodology for consumption rates is denied.

The *Colaio* plaintiffs add that the consumption rates selected by the Special Master to calculate presumed economic loss for single victims are "discriminatory" when compared to the consumption rates used for married victims or for single victims with children. However, the Special Master's methodology is rationally based and reasonably and properly implements the Act and regulations. The studies cited by the Special Master support significantly higher consumption rates for single decedents.[12] I also note that a claimant may request a hearing and show that the assumed consumption rates are not a fair reflection of the claimant's individual circumstances. Accordingly, plaintiffs' objections to the Special Master's use of consumption rates are denied.

### viii. Due Process and Equal Protection Challenges

■ The plaintiffs argue that the defendants have deprived those with annual incomes of more than $231,000 of equal protection under the Fifth Amendment, by failing to furnish presumptive award guidelines, requiring claimants in this group to bear the heavy burden of establishing "extraordinary circumstances" in order to receive awards above the presumptive awards, and withholding compensation for their full economic loss.

---

**12.** The plaintiffs have not asserted what they believe would be appropriate consumption rates for single decedents. A detailed analysis of consumption rates is outside the scope of review and beyond the expertise of this court. However, I note that the consumption rates set for single decedents in the Explanation of Process appear roughly consistent with the consumption rates for single decedents provided in "Patton–Nelson Personal Consumption Tables (1997–98 Update)" (R. at VCF100–0371–2), although each set of numbers is based on different assumptions. For example, the Patton–Nelson table bases income levels on gross family income from all adults in the family, while the Special Master's table is applied to post-tax income from only the decedent, presumably because the level of a Fund award is intended to compensate, among other things, for the decedent's lost earnings.

Plaintiffs also allege that defendants have retroactively deprived potential claimants of due process rights under the Act by imposing a needs test that alters Congress' decision to strike a particular balance between two options offered to the victims of September 11, 2001, to make a claim to the Fund, or to file a lawsuit. Lastly, Schneider contends that the Special Master's refusal to release a copy of the Price Waterhouse report violates due process.

■■■■ The Special Master's methodology of presumptive awards is to be reviewed, not according to the "strict scrutiny" standard applicable to cases involving fundamental rights or suspect classifications, but according to the "rational basis" standard. Potential fund claimants enjoy no fundamental right to an award of compensation from the September 11th Victim Compensation Fund. "[A] noncontractual claim to receive funds from the public treasury enjoys no constitutionally protected status." *Weinberger v. Salfi*, 422 U.S. 749, 772, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975). *See also Supreme Oil Co. v. Metropolitan Transp. Auth.*, 157 F.3d 148, 153 (2d Cir. 1998). Furthermore, government classifications based upon wealth alone are not suspect. *See, e.g., San Antonio Ind. School Dist. v. Rodriguez*, 411 U.S. 1, 24, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). The Act, the regulations, and the Special Master's methodology are presumed constitutional, and need only be rationally related to a legitimate governmental interest. *Weinberger*, 422 U.S. at 772, 95 S.Ct. 2457.

■■ As discussed earlier, 28 C.F.R. § 104.43, which provides presumptive award charts for incomes up to the 98th percentile, and 28 C.F.R. §§ 104.31(b)(2), 104.33(f)(2), which require claimants to present "extraordinary circumstances not adequately addressed by the presumed award" in a hearing when disputing the presumed award determination, were duly promulgated and are reasonable agency interpretations that implement congressional purpose as expressed in the provisions of the Act. Creating a demarcation at the 98th percentile has a rational basis, one recognizing the speculation inherent in projecting incomes at very high levels, and the difficulty in evaluating the "individual circumstances" of the claimant—such as his "needs" and "resources"—at these levels. 28 C.F.R. § 104.41 (2003). The "extraordinary circumstances" standard, which applies any time a claimant seeks a departure from the presumed award, likewise recognizes these uncertainties. These regulations serve the legitimate governmental interest of providing a speedy and just system of making awards. A regulatory distinction based on income does not have to do a perfect job in order to be considered a reasonable and proper implementation of congressional concern. *See Weinberger*, 422 U.S. at 777, 95 S.Ct. 2457. The same is true about the requirement that plaintiffs show extraordinary circumstances to justify awards above presumed levels.

Accordingly, I hold that the presumptive awards methodology for 98 percent of the economic population, coupled with the ability of claimants to obtain individualized hearings at which they can present their own personal circumstances, is rationally related to Congress' interest in creating an efficiently administered fund, capable of making awards within 120 days following the filing of a claim. The system remains sensitive to the particular losses, needs and resources of individual claimants and reasonably accounts for circumstances over the entire range of incomes.

Plaintiffs contend that the regulations violate the Fifth Amendment's due process clause because they "retroactively" deprive potential claimants of their right under the Act to full compensation for economic losses from the Fund in accordance with state

law. Plaintiff's argument recasts an invalid statutory claim as a constitutional argument, having no greater validity or force than the original, legally insufficient claims that have been previously discussed and rejected.

■ Lastly, I reject Schneider's claim that she is entitled, as a matter of constitutional right, to a copy of the Price Waterhouse report. Neither the Act nor the regulations mandate that the Special Master provide these types of reports to the claimants. The Price Waterhouse report, as an aid to the Special Master, calculates the components of economic loss, not the final award. No constitutional right exists to discover that which the Special Master privately uses to help him formulate a position.[13] Accordingly, there is no basis to plaintiffs' constitutional claims.

### III. Conclusion

The extraordinary events of September 11, 2001 changed all of our lives, but none more than the lives of everyone who was a child, spouse, parent, or close friend of those who died. To those who loved or depended on the victims of the terrorist attacks, no monetary remedy can be adequate; only an aching void remains to be filled.

In enacting the Victim Compensation Fund, Congress and the President sought to provide some measure of recompense for the irreparable loss of the thousands who died and were injured. They granted to the Department of Justice and the Special Master the authority to promulgate regulations, exercise wise discretion in justly and efficiently administering the Fund, and the ability to craft and implement policies and instructions with respect to that administration. After thorough review, I have found that the regulations, duly promulgated as required by law, reasonably and properly implement the provisions of the Act. Similarly, the interpretive methodologies and policies of the Special Master are reasonable and proper implementations of the Act and regulations. The duty of a judge is to give deference to the Department of Justice's regulations and respect to the Special Master's policies to the extent that they are rooted in law. I hold that the regulations and policies are lawful and valid.

For the reasons stated, I grant defendants' motions for judgment dismissing the complaints and I deny plaintiffs' motions for summary judgment.

The Clerk of the Court shall mark these three cases closed.

SO ORDERED.

---

**13.** The Act states that a claimant has the right to be represented by counsel, the right to present evidence, "and any other due process rights determined appropriate by the Special Master." Act § 405(b)(4)(C). Under *Mathews v. Eldridge*, 424 U.S. 319, 334, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), courts consider three factors to determine what process is due: "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." The plaintiffs have not addressed the *Mathews* factors and have not shown any constitutional violations.