OPINION AND ORDER GRANTING HABEAS CORPUS
 

 HELLERSTEIN, District Judge.
 

 On February 21, 2002, after he pled guilty to four counts of the Indictment, I sentenced William Crowley to a term of twenty-nine months incarceration, with a recommendation to the Bureau of Prisons (BOP) that he serve the final eighteen months of that sentence in a halfway house, or Community Confinement Center (CCC). At that time, the BOP adhered to a longstanding practice of transferring inmates from custodial facilities to serve the final six months of their terms in CCCs, with possible discretion before that period for proper cause. In December 2002, pursuant to a new legal interpretation adopted by the U.S. Department of Justice (DOJ), the BOP placed tighter limitations upon the length of time prisoners could spend in CCCs, to the extent that Mr. Crowley would be able to spend only the final two months of his sentence in such an institution. Mr. Crowley now brings a petition for a writ of habeas corpus, challenging the new BOP procedure and its retroactive application to his sentence. At a hearing held on February 19, 2004, I granted Mr. Crowley’s petition, and ordered the BOP to consider transferring Mr. Crowley to a CCC consistent with its policies and procedures in effect at the time I sentenced him, on February 21, 2002, prior to the change caused to be made by the Department of Justice, on and after December 16, 2002. I write to set out my reasons.
 

 Background
 

 Under the United States Sentencing Guidelines, Mr. Crowley’s Offense Level was 29 and his Criminal History Category was I. Accordingly, his sentencing range was between 87 and 108 months. However, the defense moved for a downward departure, supported by the government’s letter describing Mr. Crowley’s substantial
 
 *CDXCVII
 
 cooperation and assistance in helping the government’s investigation and in testifying in the trials of his co-defendants.
 
 See
 
 U.S. Sentencing Guidelines § 5K1.1 (Departure for substantial assistance to authorities).
 

 In considering the sentence I should give to Mr. Crowley, I considered other factors as well. Mr. Crowley had a serious condition of Crohn’s disease, requiring recurrent balancing of medicines, generally much better performed by local medical practitioners, who would be consistently treating him, than by medical services available to prisoners. His close family relationships, including with his teenage children, also persuaded me that, if possible, he should complete his term in a manner which might enable him to be available to help his family. Finally, he had shown, not only a full acceptance of responsibility for the crimes of fraud to which he had pleaded (and which he helped the government to unravel and prosecute), but substantial and tangible remorse as well, by unstinting and dedicated service as a volunteer worker at neighboring hospital facilities. Although I rejected these factors as independent grounds for departure,
 
 see
 
 Feb. 21, 2002 Tr., at 38-39, I had the ability to consider these as additional bases for departure under § 5K1.1, and I therefore took them into account when determining Mr. Crowley’s sentence.
 

 In fashioning a sentence for Mr. Crowley, I wanted to reflect both the seriousness of his crime and the factors discussed above. I sentenced Mr. Crowley to one-third of the Guidelines minimum, or twenty-nine months incarceration, relying on the discretion that the Bureau of Prisons had to transfer Mr. Crowley from a custodial facility to a CCC in his neighborhood. I recommended that the BOP consider such a transfer beginning with the last 18 months of his term (after he served somewhat less than a year in a custodial facility), understanding that it was BOP policy to transfer custodial prisoners to a CCC for the last six months of a term. If I had known that the BOP’s policy would be that which later was ordered, I believe that I would have sentenced Mr. Crowley to a lesser term, that is, departed farther than I ordered in my sentence.
 

 Discussion
 

 1. Subject Matter Jurisdiction
 

 As an initial matter, I note that Mr. Crowley filed his petition pursuant to 28 U.S.C. §§ 1331, 2241(a), (c)(1), 2243, and 2255. Prior decisions in this district have held that the district courts may properly exercise subject matter jurisdiction on the issue before me, pursuant to one or more of those statutes.
 
 See Cohn v. Bureau of Prisons,
 
 302 F.Supp.2d 267, 270 (S.D.N.Y.2004),
 
 Zucker v. Menifee,
 
 03 Civ. 10077, 2004 WL 102779, at *2-4, 2004 U.S. Dist. Lexis 724, at *8-*11 (S.D.N.Y. Jan. 21, 2004);
 
 Cato v. Menifee,
 
 03 Civ. 5979, 2003 WL 22725524, at *3 n. 1, 2003 U.S. Dist. Lexis 21289, at *8 n. 1 (S.D.N.Y. Nov. 20, 2003);
 
 cf. Adler v. Menifee,
 
 293 F.Supp.2d 363, 366-67 (S.D.N.Y.2003) (holding that a similar petition was deficient as filed under § 2255, but would have been properly filed under § 2241, and that “[bjecause liberty is at stake, the Court should not be delayed by such technicalities, and treats the matter as a Petition filed under § 2241 of Title 28”). I join this weight of precedent and hold that the petition was properly filed and my exercise of jurisdiction is appropriate.
 

 2. Statutory Authority
 

 Under Sentencing Guidelines § 5C1.1, a defendant who is a Zone A or B offender is eligible for a sentence which begins with, and is served entirely through, probation or supervised release, with a condition of placement in a CCC.
 
 See
 
 § 5Cl.l(b), (c)(2)-
 
 *CDXCVIII
 
 (3). A Zone C offender may serve up to half of his sentence through a term of supervised release that includes a condition of placement in a CCC.
 
 See
 
 § 5Cl.l(d)(2). A Zone D offender must serve his sentence through imprisonment alone, and is not afforded the option of substituting a term of probation or supervised release.
 
 See
 
 § 5Cl.l(f). Even after I granted a departure, Mr. Crowley’s sentence classified him as a Zone D offender, who must begin his sentence in prison.
 

 Where a defendant begins his sentence in a prison, two statutory provisions are relevant to authority of the BOP to transfer inmates from penal facilities to CCCs. The first is a broad grant of authority to the BOP, contained in 18 U.S.C. § 3621(b), to “at any time ... direct the transfer of a prisoner from one penal or correctional facility to another”:
 

 The Bureau of Prisons shall designate the place of the prisoner’s imprisonment. The Bureau may designate any available penal or correctional facility that meets minimum standards of health and habitability established by the Bureau, whether maintained by the Federal Government or otherwise and whether within or without the judicial district in which the person was convicted, that the Bureau determines to be appropriate and suitable, considering [enumerated factors]. The Bureau may at any time, having regard for the same matters, direct the transfer of a prisoner from one penal or correctional facility to another....
 

 The second statute, 18 U.S.C. § 3624(c), makes mandatory such a transfer at the end of a prisoner’s term, in the last ten percent or six months, whichever is less. The statute reads:
 

 The Bureau of Prisons shall, to the extent practicable, assure that a prisoner serving a term of imprisonment spends a reasonable part, not to exceed six months, of the last 10 per centum of the term to be served under conditions that will afford the prisoner a reasonable opportunity to adjust to and prepare for the prisoner’s re-entry into the community. The authority provided by this subsection may be used to place a prisoner in home confinement. The United States Probation System shall, to the extent practicable, offer assistance to a prisoner during such pre-release custody.
 

 The BOP’s changed policy follows the latter provision, and neglects the former.
 
 See Monahan v. Winn,
 
 276 F.Supp.2d 196, 211 (D.Mass.2003) (critiquing change of policy; “[w]hat one statute, § 3624(c), requires and another, § 3621(b), allows the BOP to do are two separate matters”). The pre-December 2002 policy, which addresses when a prisoner is eligible for transfer to a CCC even before his final ten percent or six months, is governed by the broader grant of authority in 18 U.S.C. § 3621(b).
 

 3. BOP Practice and Policy
 

 Prior to December 2002, the BOP adhered to a longstanding policy of transferring inmates to CCCs to serve the final six months of their sentences. This BOP policy was reflected in a number of documents. A Program Statement issued by the DOJ in 1998 described CCCs as “an excellent transitional environment for inmates nearing the end of their sentences,” explaining that “[o]ne reason for referring an inmate to a CCC is to increase public protection by aiding the transition of the offender into the community. Participating in community-based transitional services may reduce the likelihood of an inmate with limited resources from recidivating.” U.S. Department of Justice, Program Statement, No. 7310.04
 
 *CDXCIX
 
 (Dec. 16, 1998), at 1. The BOP thus “establish[ed] an operational philosophy for CCC referrals that, whenever possible, eligible inmates are to be released to the community through a CCC unless there is some impediment.”
 
 Id.
 
 Very clearly, the Program Statement provided, “The following CCC referral guidelines apply: (1) An inmate may be referred up to 180 days, with placement beyond 180 days highly unusual.”
 
 Id.
 
 at 8. The document relied on 18 U.S.C. §§ 3624(c) and 3621(b) as its statutory authority.
 

 Other BOP documents prior to December 2002 also reflected its CCC policy and its understanding of the scope of its authority. For instance, a Memorandum Opinion of the DOJ’s Office of Legal Counsel issued in 1992 dealt with the question of whether the BOP had statutory authority to contract with the private sector for prison facilities. That Memorandum interpreted § 3621(b) as providing the BOP with “open-ended authority” and quotes the statute’s legislative history as intending to authorize the BOP to “designate any available, suitable and appropriate institutions.” Memorandum Opinion, U.S. Department of Justice, Office of Legal Counsel, to Director, Bureau of Prisons (March 25, 1992), available at http://www.us-doj.gov/olc.quinlan.15.htm, at II. The Memorandum took the position that there is “no statutory basis in section 3621(b) for distinguishing between residential community facilities and secure facilities. Because the plain language of section 3621(b) allows the BOP to designate ‘any available penal or correctional facility,’ we are unwilling to find a limitation on that designation authority.”
 
 Id.; see also
 
 sources cited in
 
 Monahan,
 
 276 F.Supp.2d at 205 n. 9 (referencing several other sources) and
 
 Iacaboni v. United States,
 
 251 F.Supp.2d 1015, 1022, 1026-27 (D.Mass.2003) (discussing other BOP assurances of, and documents embodying, the former policy).
 

 On December 13, 2002, however, the DOJ’s Office of Legal Counsel issued a Memorandum (the OLC Memorandum) stating that the BOP policy was unlawful. The OLC Memorandum reviewed statutory authority, caselaw, and the Sentencing Guidelines, and reached the conclusion that the BOP was without authority to assign inmates to CCCs except to the extent of the final ten percent of their terms, or six months, whichever was less. Three days later, Deputy Attorney General Larry D. Thompson adopted the Office of Legal Counsel’s position in a letter to Kathleen Hawk Sawyer, Director of the BOP (the Implementing Letter). Because Mr. Crowley’s sentence was for twenty-nine months, he would become eligible only for the final 2.9 months of his sentence, which, the record shows, the BOP would reduce to two months, as the next lowest full month.
 

 4. Administrative Procedure Act
 

 There is no question that the BOP has the power to regulate pursuant to the statute, and to place limits on prisoner designation and transfers. However, the BOP did not so regulate in December 2002. The OLC Memorandum “analyzes the Bureau’s statutory authority to designate inmates to CCCs as more limited than we have previously practiced.” Implementing Letter at 1. The BOP interpreted a statute against its own settled policy, and then followed it, rather than issue a regulation relying upon BOP expertise and experience and following notice-and-comment procedures. “[T]he BOP has not merely announced that, within its general grant of authority, it has chosen to exercise its discretion by closing off community confinement to a particular offender or class of offenders. Rather, the BOP has announced that, based on its interpretation of the law, it views itself as
 
 *D
 
 legally barred from placing inmates in community corrections for the imprisonment portions of their sentences.”
 
 Iacaboni,
 
 251 F.Supp.2d at 1035. The BOP thus engaged in interpretation, rather than regulation.
 

 Even if the BOP documents were intended as, or had the effect of, regulations, they would nevertheless be invalid. It is undisputed that the BOP provided no notice or opportunity for public comment, as required by 5 U.S.C. § 553 and the other rulemaking provisions of the Administrative Procedure Act. These provisions are fully applicable to regulations promulgated under 18 U.S.C. § 3621. Although 18 U.S.C. § 3625, “Inapplicability of the Administrative Procedure Act,” explicitly declares the inapplicability to BOP decisions under § 3621 of “sections 554 and 555 and 701 through 706 of title 5, United States Code,” it does not exclude such BOP decisions from coverage under 5 U.S.C. § 553 and other sections requiring and governing notice-and-comment rule-making.
 
 See Iacaboni,
 
 251 F.Supp.2d at 1036 (citing legislative history and caselaw supporting this conclusion). The notice- and-comment provisions of the APA thus remain applicable to BOP regulations.
 

 It is well established that if a regulation has not been promulgated in proper compliance with the APA, that regulation is rendered invalid.
 
 See, e.g., Citizens to Preserve Overton Park, Inc. v. Volpe,
 
 401 U.S. 402, 417, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971);
 
 Chrysler Corp. v. Brown,
 
 441 U.S. 281, 313, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979) (“[C]ourts are charged with ... ensuring that agencies comply with the outline of ‘minimum essential rights and procedures’ set out in the APA. Certainly regulations subject to the APA cannot be afforded the ‘force and effect of law’ if not promulgated pursuant to the statutory procedural minimum found in that Act.” (citations omitted));
 
 see also Motor Vehicle Manufacturers Ass’n, et al. v. State Farm Mutual Automobile Insurance Co., et al.,
 
 463 U.S. 29, 42, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (“an agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance”). If the new BOP policy were to be considered a regulation, it would be invalid as. not promulgated pursuant to the APA’s rulemaking procedures.
 

 5. Statutory Interpretation
 

 If the BOP change of policy is not a regulation, it is instead a changed interpretation of 18 U.S.C. § 3621(b). In matters involving agency interpretations of statutes, the Supreme Court has explained that the first issue is whether and to what extent the courts must give deference to the agency interpretation. Under
 
 Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,
 
 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), while “[t]he judiciary is the final authority on issues of statutory construction,”
 
 id.
 
 at 843 n. 9, 104 S.Ct. 2778, the judiciary is required to defer to an agency interpretation “[wjhen a court reviews an agency’s construction of the statute which it administers,” Congress has not “directly spoken to the precise question at issue,” and “the agency’s answer is based on a permissible construction of the statute.”
 
 Id.
 
 at 837-38, 104 S.Ct. 2778.
 

 United States v. Mead,
 
 533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001), considers the circumstances when
 
 Chevron
 
 might be applicable.
 
 Mead
 
 holds that
 
 Chevron
 
 deference is due “when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated
 
 *DI
 
 in the exercise of that authority.”
 
 Id.
 
 at 226-27, 121 S.Ct. 2164. This delegation must be pertinent to the “particular question” at issue,
 
 id.
 
 at 228, 121 S.Ct. 2164 (quoting
 
 Chevron,
 
 467 U.S. at 844, 104 S.Ct. 2778); indeed, in
 
 Mead
 
 itself, where the “particular question” was the deference due to a tariff classification ruling by the U.S. Customs Service, the Court noted that although the Customs Service may have had general rulemaking power, it lacked such power with regard to the particular statutory scheme it was interpreting.
 
 Id.
 
 at 231-32, 121 S.Ct. 2164.
 

 Mead
 
 also sets forth guidelines regarding when a court should find that
 
 Chevron
 
 deference applies, when Congress has delegated rulemaking authority to the agency implicitly, rather than expressly. One “very good indicator of delegation meriting
 
 Chevron
 
 treatment,”
 
 id.
 
 at 229, 121 S.Ct. 2164, is whether Congress has authorized notice-and-comment rulemaking, and whether the rule at issue has been promulgated pursuant to such authority. Even in the absence of such a benchmark, however, “it can still be apparent from the agency’s generally conferred authority and other statutory circumstances that Congress would expect the agency to be able to speak with the force of law when it addresses ambiguity in the statute or fills a space in the enacted law.”
 
 Id.
 

 If
 
 Chevron
 
 deference is not due,
 
 Mead
 
 holds that I must give the BOP policy deference under
 
 Skidmore v. Swift & Co.,
 
 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944). Under
 
 Skidmore,
 
 administrative interpretations “constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.”
 
 Id.
 
 at 140, 65 S.Ct. 161.
 

 The BOP’s December 2002 interpretation was not made pursuant to notice-and-comment rulemaking. Moreover, it is nowhere apparent from the statutory text or from the evidence presented on the record that Congress has delegated to the BOP rulemaking authority with regard to the precise question at issue — whether 18 U.S.C. § 3621(b) includes in its scope the authority to designate inmates to CCCs at various times during their imprisonment.
 

 Further,
 
 Mead
 
 and
 
 Chevron
 
 explain that a key rationale behind affording deference to agencies is that their interpretations are properly informed by their experience and their expertise.
 
 See Mead,
 
 533 U.S. at 234, 121 S.Ct. 2164 (noting the “ ‘specialized experience and broader investigations and information’ available to the agency” (quoting
 
 Skidmore,
 
 323 U.S. at 139, 65 S.Ct. 161));
 
 Chevron,
 
 467 U.S. at 844, 104 S.Ct. 2778 (grounding deference in cases where the policy at issue “has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations”);
 
 id.
 
 at 865, 104 S.Ct. 2778 (contrasting judges, who “are not experts in the field,” with “those with great expertise”). The BOP’s new procedure does not rest in any part on its experience or expertise. The OLC Memorandum and the December 16, 2002 letter argue not that restricting access to CCCs has proven a better strategy for the rehabilitation of inmates or for accomplishing any other policy goal, but rather that the BOP’s decision is based in statutory interpretation. Thus the record is devoid of any indication that this important policy consideration would support
 
 Chevron
 
 deference in the instant case.
 

 In
 
 Reno v. Koray,
 
 515 U.S. 50, 115 S.Ct. 2021, 132 L.Ed.2d 46 (1995), the question
 
 *DII
 
 was whether the defendant was entitled to credits for time served where he was released on bail and ordered confined to a CCC. In analyzing the relevant authorities, the Supreme Court gave “some deference,” but not full
 
 Chevron
 
 deference, to a BOP Program Statement, which it described as “an internal agency guideline ... akin to an ‘interpretive rule’ ” not subject to the mandates of the Administrative Procedure Act.
 
 Id.
 
 at 61, 115 S.Ct. 2021. The OLC Memorandum, and the policy adopted pursuant to it, are equivalent. They, too, are internal BOP guidelines which are intended as interpretive rules, and the indicia of an interpretation requiring full
 
 Chevron
 
 deference which the Supreme Court found lacking in
 
 Koray
 
 are equally lacking in this case.
 

 A useful contrast is provided by my opinion in
 
 Colaio v. Feinberg,
 
 262 F.Supp.2d 273, 287-88 (2003),
 
 aff'd, Schneider v. Feinberg,
 
 345 F.3d 135 (2d Cir.2003). I held that the policies of the Special Master of the September 11th Victim Compensation Fund of 2001 were entitled to
 
 Chevron
 
 deference, even though they were not subject to notice-and-comment rulemaking. I determined that “the Special Master’s policies do not contradict the Act or its regulations, are supported by evidence and valid reasoning, and are persuasive as carrying out congressional intent.”
 
 Id.
 
 at 289, 262 F.Supp.2d 273. I also found that “they reflect the Special Master’s deep and extensive experience in mass tort litigation.”
 
 Id.
 
 at 291;
 
 see also Schneider,
 
 345 F.3d at 143 (“[t]he district court properly held that — to the extent they do not contradict Title IV’s clear and unambiguous
 
 meaning
 
 — Chevron deference is owed” to the procedures adopted by the Special Master). The factors supporting a conclusion that
 
 Chevron
 
 deference was appropriate in
 
 Colaio
 
 support the opposite conclusion here. The new BOP policy contradicts a previous policy which was consistently adhered to over many years' — perhaps as many as forty,
 
 see Iacaboni,
 
 251 F.Supp.2d at 1025—and they are backed by faulty statutory interpretation, with no indication of reliance upon any practical experience or expertise.
 

 As in
 
 Koray,
 
 even if the BOP interpretation is not owed
 
 Chevron
 
 deference, it is still owed “some deference” under
 
 Skidmore,
 
 based on the interpretation’s persuasive power.
 
 Koray,
 
 515 U.S. at 61, 115 S.Ct. 2021. However, I do not find the OLC Memorandum or the Implementing Letter, changing a procedure in effect for many years, persuasive. First, the plain meaning of the statute does not suggest any such limitation; “the place of the prisoner’s imprisonment” and “any available penal or correctional facility” are broad enough terms to include CCCs, and broad definitions of these terms are not restricted by other Congressional pronouncements. The United States Code, the Sentencing Guidelines, and the Code of Federal Regulations all fail to define the terms “place of imprisonment” and “penal or correctional facility,” as they appear in § 3621(b).
 
 See Monahan,
 
 276 F.Supp.2d at 212 (“No other provision in the United States Code (and certainly nothing in the Sentencing Guidelines) purports to curb that discretion.”).
 
 [1]
 

 
 *DIII
 
 A number of sources for defining “penal or correctional facility” as including CCCs are found in the caselaw. Perhaps most notable is BOP Program Statement No. 7310.01, which
 

 is an internal directive ... allowing the Bureau of Prisons to place sentenced prisoners in community corrections centers recognizing that such centers meet Section 3621(b)’s definition of a penal or correctional facility.... Program Statement No. 7310.01 further provides that because, contrary to home confinement, confinement to such centers is deemed to be confinement to a “penal or correctional facility,” the Bureau of Prisons “is not restricted by Section 3624(c)” in designating inmates to community corrections center confinement for more than the last ten per cent, or more than six months, of their remaining sentence. The Bureau of Prisons is bound to observe the ten percent restriction, however, as to home confinement.
 

 United States v. Morales-Morales,
 
 985 F.Supp. 229, 231 (D.P.R.1997). The BOP has reaffirmed this interpretation elsewhere, too; for instance, the Joint Report to Congress, U.S. Sentencing Commission and Federal Bureau of Prisons, Maximum Utilization of Prison Resources (June 30, 1994), at 9-10, stated that “Community correction centers (CCC) provide two program components within their facilities: a pre-release component and a community corrections component.”
 
 See Howard v. Ashcroft,
 
 248 F.Supp.2d 518, 539 (M.D.La.2003) (citing Joint Report to Congress). BOP Program Statement 7310.02 also maintained the BOP’s authority “to place sentenced prisoners in [CCCs], since such centers met 18 U.S.C. § 3621(b)’s definition of a ‘penal or correctional facility.’ ”
 
 See Cato,
 
 2003 WL 22725524, at *5, 2003 U.S. Dist. Lexis 21289, at *13 (citing Program Statement 7310.02). Other cases have found support for this interpretation of § 3621(b) in the legislative history of that provision and of its predecessor statute, 18 USC § 4082(a),
 
 see Zucker,
 
 2004 WL 102779, at *8-10, 2004 U.S. Dist. Lexis 724, at *26-30;
 
 Estes v. Bureau of Prisons,
 
 273 F.Supp.2d 1301, 1309 (S.D.Ala.2003); from canons of statutory interpretation,
 
 see Byrd v. Moore,
 
 252 F.Supp.2d 293, 300 (W.D.N.C.2003);
 
 [2]
 
 from the structure of the Sentencing Guidelines,
 
 see Zucker,
 
 2004 WL 102779, at *6-7, 2004 U.S. Dist. Lexis 724, at *20-22; and from a survey of dictionary definitions,
 
 see Howard,
 
 248 F.Supp.2d at 539-40.
 
 See generally Zucker,
 
 2004 WL 102779, at *5-10, 2004 U.S. Dist. Lexis 724, at *17-30;
 
 Iacaboni,
 
 251 F.Supp.2d at 1024-28.
 

 Although the discussion in the Supreme Court and circuit levels has not to date been as precisely focused on this question, what precedent there is seems to favor this interpretation as well. In
 
 Reno v. Koray,
 
 Chief Justice Rehnquist, for the majority, held that the defendant was not entitled to credit for time served while he was released on bail, subject to a condition of confinement in a CCC. However, the Chief Justice explained that the outcome would have been different had the defendant
 
 *DIV
 
 been “confined to a community treatment center after having been ‘detained’ and committed to the Bureau’s custody.” 515 U.S. at 64, 115 S.Ct. 2021. The clear implication of this holding is that so long as a defendant is committed to BOP custody, a CCC would qualify as detention.
 
 See Iacaboni,
 
 251 F.Supp.2d at 1027 (reviewing Koray).
 

 Several circuit courts have also spoken to the breadth of the BOP’s authority. The Second Circuit has adopted the position of the Third Circuit, in
 
 Barden v. Keohane,
 
 921 F.2d 476 (3d Cir.1990), that a proper reading of § 3621(b) “grants broad discretion to the Bureau in designating a place of imprisonment.”
 
 McCarthy v. Doe,
 
 146 F.3d 118, 123 (2d Cir.1998) (following
 
 Barden).
 
 And the Tenth Circuit has held that § 3621(b) “authorizes the Bureau of Prisons to designate the place of a prisoner’s imprisonment.” 18 U.S.C. § 3621(b). The term “imprisonment” refers to any type of custody, including custody in a correctional facility or home confinement program.
 
 Moresco v. United States,
 
 982 F.2d 529, 1992 WL 372399, at *2 (10th Cir.1992).
 

 Finally, there is plentiful support from a variety of sources for interpreting the BOP’s authority as lawful, including support even from the BOP itself, in the pre-December 2002 documents cited above. In contrast to this wealth of support, the interpretation expressed in the OLC Memorandum is inconsistent with earlier understandings of the statute, and it was adopted abruptly, suggesting not a change based on experience, but rather a tendentious interpretation.
 
 See Iacaboni,
 
 251 F.Supp.2d at 1028-35 (dismantling arguments made in the OLC Memorandum). These reasons and others persuade me, as they did Judge Chin, that “a CCC is a ‘penal or correctional facility’ and community confinement is ‘imprisonment.’ ”
 
 Cato,
 
 2003 WL 22725524, *4, 2003 U.S. Dist. 21289, at *12. Accordingly, the grant of authority to the BOP in 18 U.S.C. § 3621(b) is broad enough to encompass the power to designate or transfer inmates to CCCs prior to the final ten percent of their terms, and the OLC Memorandum and the subsequent change in BOP policy are invalid, as they are based on incorrect readings of 18 U.S.C. § 3621(b).
 

 6. Ex Post Facto Clause
 

 Even if the new BOP policy is lawful, it cannot be lawful with regard to William Crowley’s sentence. Because his sentence was imposed before the December 2002 policy was adopted, the Ex Post Facto Clause of the United States Constitution (Art. I, § 9, cl.3) bars retroactive application of the policy to Crowley’s sentence.
 

 The Supreme Court, in
 
 Weaver v. Graham,
 
 450 U.S. 24, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981) and
 
 Lynce v. Mathis,
 
 519 U.S. 433, 117 S.Ct. 891, 137 L.Ed.2d 63 (1997), held that state statutes retroactively canceling early release credits violated the Ex Post Facto Clause, because such credits are a factor upon which petitioner relies in negotiating his plea and upon which the judge relies in sentencing. In
 
 Weaver,
 
 good time credits were at issue; in
 
 Lynce,
 
 overcrowding credits. In both cases, the Court held the statutes unconstitutional, observing that laws which inflict “ ‘greater punishment, than the law annexed to the crime, when committed’... implicate the central concerns of the Ex Post Facto Clause.”
 
 Lynce,
 
 519 U.S. at 441, 117 S.Ct. 891 (quoting
 
 Calder v. Bull,
 
 3 U.S. 386, 390, 3 Dall. 386, 1 L.Ed. 648 (1798)). The fact that reduced confinement was not guaranteed was held to be irrelevant in those cases; “a law need not impair a ‘vested right’ to violate the ex post facto prohibition.”
 
 Weaver,
 
 450 U.S.
 
 *DV
 
 at 29, 101 S.Ct. 960. Following
 
 Weaver
 
 and
 
 Lynce,
 
 several circuits have held “that the ex post facto prohibition applies to administrative rules that purport to correct or clarify a misapplied existing law, provided the new rule was not foreseeable.”
 
 Ashkenazi v. Attorney General,
 
 246 F.Supp.2d 1, 6, (D.D.C.2003),
 
 vacated as moot,
 
 346 F.3d 191 (D.C.Cir.2003) (citing
 
 Smith v. Scott,
 
 223 F.3d 1191 (10th Cir.2000);
 
 Knuck v. Wainwright,
 
 759 F.2d 856 (11th Cir.1985);
 
 Love v. Fitzharris,
 
 460 F.2d 382 (9th Cir.1972)).
 

 As the transcript of sentence demonstrates, I relied in this case on § 3621 and the BOP regulatory scheme that existed at the time I sentenced Mr. Crowley. I had recommended that the BOP begin its consideration of transferring Mr. Crowley to a CCC eighteen months short of his term, expecting that under then-existing BOP policy, it would consider such a transfer then for Mr. Crowley’s final six months. By changing that policy in December 2002 and abandoning its representation, the BOP has “applied] [its policy] to events occurring before its enactment” and “disadvantage[d] the offender affected by it” by “increasing the punishment for the crime.”
 
 Lynce,
 
 519 U.S. at 441, 117 S.Ct. 891. Such activity falls squarely within the ambit of the Ex Post Facto Clause.
 

 I note in conclusion that this debate has raged in judicial fora throughout the country, with district courts reaching opposing conclusions.
 
 See, e.g., Cohn,
 
 at 275 (collecting cases holding both ways);
 
 Cioffoletti v. Bureau of Prisons,
 
 03 Civ. 3220, 2003 WL 23208216, at *3, 2003 U.S. Dist. Lexis 21853, at *8 (E.D.N.Y. Nov. 6, 2003) (citing prominent cases granting petition);
 
 Smith v. United States,
 
 277 F.Supp.2d 100, 110 n. 5 (D.D.C.2003) (listing cases holding both ways on the ex post facto and APA arguments);
 
 Monahan,
 
 276 F.Supp.2d at 199 (collecting cases invalidating the new BOP policy);
 
 Tipton v. Bureau of Prisons,
 
 262 F.Supp.2d 633, 636 n. 2 (D.Md.2003) (same). My opinion reaches the same conclusion as four other judges in the Southern District of New York: Judge Sweet in
 
 Distefano v. Bureau of Prisons,
 
 04 Civ. 7, 2004 WL 396999, 2004 U.S. Dist. Lexis 3190 (S.D.N.Y. March 4, 2004); Judge Holwell in
 
 Zucker,
 
 Judge Chin in
 
 Cato,
 
 and Judge Wood in
 
 Greenfield v. Menifee,
 
 03 Civ. 8205, 2003 WL 23181269 (S.D.N.Y. Nov. 30, 2003) (Wood, J.) (transcript of oral argument). While I diverge from the holdings of Judge Pauley in
 
 Cohn
 
 and Judge Brieant in
 
 Adler,
 
 the facts of their cases are different, for there is no indication that the sentencing judges in either
 
 Cohn
 
 or
 
 Adler
 
 had relied upon BOP procedure.
 
 See Cohn,
 
 at 267;
 
 Adler,
 
 293 F. Supp 2d 363, 365. By contrast, I did rely on the prior BOP regime in fashioning my sentence. The weight of the precedent, in cases similar to Mr. Crowley’s, supports my conclusion.
 

 Conclusion
 

 Accordingly, I grant Mr. Crowley the writ of habeas corpus, and refer the matter to the BOP for reconsideration of the appropriateness of transferring Mr. Crowley to a CCC immediately, in light of the BOP’s policy prior to December 2002. The BOP, through its attorney, has represented to me that it will do so quickly and in good faith, and I accept and rely upon that representation. Should either party require further judicial involvement, I will retain jurisdiction.
 

 SO ORDERED.
 

 [1]
 

 . The 2002 edition of the Sentencing Guidelines includes a footnote to §§ 5C1.1, 5D1.3, and 5F1.1, which cautions that under the Antiterrorism and Effective Death Penalty Act of 1996, "[i]t would appear that ... community confinement now is not authorized as a condition of supervised release,” even though "there is some question as to whether Congress intended this result.” This footnote, and the fact that the Guidelines provision itself has been retained, supports the conclusion that community confinement is authorized as part of a sentence of imprisonment or probation, even if not as part of a sentence of
 
 *DIII
 
 supervised release. I note that this footnote did not appear in the Guidelines Manual prior to 2002, and as such was inapplicable to Mr. Crowley's case.
 

 [2]
 

 .
 
 Byrd
 
 draws forceful support for its reading of "penal or correctional facility” from 18 U.S.C. § 3622(c), which provides that prisoners, in some situations, may "work at paid employment in the community while continuing in official detention at the penal or correctional facility.” Along parallel lines, I note that 18 U.S.C. § 3624(c) uses the language "term of imprisonment” in a context clearly referring to CCCs,
 
 see
 
 supra, and 18 U.S.C. § 3551(b) uses the same language in a context implicitly including them.
 
 See Iacaboni,
 
 251 F.Supp.2d at 1024.