Stephen MOSS, Petitioner,

v.

Craig APKER, Warden, in his official capacity, Respondent.

No. 05 Civ. 2676(VM).

United States District Court, S.D. New York.

July 6, 2005.

---

### DECISION AND ORDER

MARRERO, District Judge.

*Pro se* petitioner Stephen Moss ("Moss"), an inmate in the custody of the Federal Bureau of Prisons ("BOP") at the Federal Correctional Institution in Otisville, New York ("FCI Otisville"), seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2241, alleging that the BOP policy regulating the availability of inmate placement in a community corrections center ("CCC") (1) violates the notice and comment requirements of the Administrative Procedure Act ("APA"); (2) is based on an erroneous interpretation of 18 U.S.C. § 3621(b); and (3) as applied to him, is a violation of the Ex Post Facto Clause of the Constitution. Moss requests that the BOP immediately consider his eligibility for transfer to a CCC under its pre-December 2002 designation policy.

For the reasons set forth below, Moss's petition is denied.

### I. BACKGROUND

#### A. PROCEDURAL HISTORY

Moss pled guilty to unlawful possession of a sawed-off shotgun, in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871, on February 25, 2003. (*See* Judgment and Commitment Order ("J & C"), attached as Ex. C to Declaration of Adam M. Johnson, dated June 2, 2005 ("Johnson Decl.")). According to Moss's J & C, his offense conduct ended in March of 2002. Moss was sentenced on October 14, 2004, by United States District Judge Norman A. Mordue of the Northern District of New

York, to serve twelve months and one day in prison. Following the recommendation made by Judge Mordue on the J.& C, the BOP designated Moss to FCI Otisville, and he began serving his sentence of imprisonment in that facility on November 30, 2004. According to respondent Craig Apker, Warden of FCI Otisville ("Respondent"), under the calculations used by BOP to determine the duration of Moss's imprisonment, Moss's custody expires on November 24, 2005, but if he receives all of his good conduct time credit, he would be released on October 8, 2005. (*See* Respondent's Memorandum of Law in Opposition to Petition for Writ of Habeas Corpus, dated June 3, 2005, ("Respondent Mem.") at 2 n. 1.) Moss's habeas petition was filed on March 2, 2005. (*See* Petition under 28 U.S.C. § 2241 for Writ of Habeas Corpus, dated Feb. 4, 2004 ("Pet.").)

Moss's petition challenges the lawfulness of the BOP policy that became effective on December 20, 2002. This policy reflected a change in the BOP's long standing approach to CCC designation under 18 U.S.C. §§ 3621(b)[1] and 3624(c)[2] (" § 3621(b)" and " § 3624(c)"). In his Traverse, Moss also asserts that a more recent BOP policy, which became effective on February 14, 2005, is unlawful. The history of BOP's CCC placement policy is discussed below.

## B. HISTORY OF BOP's CCC PLACEMENT POLICY

The history of the BOP's approach to placing inmates in CCCs is extensively discussed in numerous opinions addressing issues similar to the ones before the Court. *See, e.g., Levine v. Menifee,* 05 Civ.1902, 2005 WL 1384021, at *1–*3 (S.D.N.Y. June 9, 2005); *Pimentel v. Gonzales,* 367 F.Supp.2d 365, 367–69 (S.D.N.Y.2005); *Wiesel v. Menifee,* 04 Civ. 9681, 2005 WL

**1.** Section 3621(b) provides, in full:
The Bureau of Prisons shall designate the place of the prisoner's imprisonment. The Bureau may designate any available penal or correctional facility that meets minimum standards of health and habitability established by the Bureau, whether maintained by the Federal Government or otherwise and whether within or without the judicial district in which the person was convicted, that the Bureau determines to be appropriate and suitable, considering—
(1) the resources of the facility contemplated;
(2) the nature and circumstances of the offense;
(3) the history and characteristics of the prisoner;
(4) any statement by the court that imposed the sentence—
(A) concerning the purposes for which the sentence to imprisonment was determined to be warranted; or
(B) recommending a type of penal or correctional facility as appropriate; and
(5) any pertinent policy statement issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28.

In designating the place of imprisonment or making transfers under this subsection, there shall be no favoritism given to prisoners of high social or economic status. The Bureau may at any time, having regard for the same matters, direct the transfer of a prisoner from one penal or correctional facility to another.
18 U.S.C. § 3621(b).

**2.** Section 3624(c) provides, in full:

The Bureau of Prisons shall, to the extent practicable, assure that a prisoner serving a term of imprisonment spends a reasonable part, not to exceed six months, of the last 10 per centum of the term to be served under conditions that will afford the prisoner a reasonable opportunity to adjust to and prepare for the prisoner's re-entry into the community. The authority provided by this subsection may be used to place a prisoner in home confinement. The United States Probation System shall, to the extent practicable, offer assistance to a prisoner during such pre-release custody.
18 U.S.C. § 3624(c).

1036297, at *1–*3 (S.D.N.Y. May 2, 2005); *Yip v. Federal ·Bureau of Prisons*, 363 F.Supp.2d 548, 550–51 (E.D.N.Y.2005); *Drew v. Menifee*, 04 Civ. 9944, 2005 WL 525449, at *1–*2 (S.D.N.Y. Mar.4, 2005). As relevant here, the BOP placement policy has undergone two significant changes since 2002.

Under the pre-December 2002 policy, the BOP could place inmates in CCCs at any time prior to their release date, and inmates presumably could serve their entire sentence in a CCC. The BOP regularly transferred inmates to CCCs for approximately the last six months of their sentence, without regard to the conditions for placement in CCCs set forth in § 3624(c). Moss alleges that, pursuant to this policy, he would have been eligible for transfer to a CCC on or about May 14, 2005. (*See* Pet. at 2–3.)

In December of 2002, following receipt of a memorandum issued by the Department of Justice's Office of Legal Counsel concluding that its prior CCC placement practice was illegal, the BOP determined that CCC designations would be limited to the last ten percent of a prisoner's sentence, not to exceed six months. (*See* Memorandum from Federal Bureau of Prisons, U.S. Department of Justice, to Chief Executive Officers (Dec. 20, 2002) (the "December 2002 Policy"), attached as Ex. C to Pet.) Under the revised policy, no defendant sentenced to a term of imprisonment would be assigned to a CCC in the first instance.

The December 2002 Policy led to a number of habeas corpus petitions. Two circuit courts, though not the Second Circuit,

deemed the policy invalid ·as contradicting the plain meaning of § 3621(b). *See Goldings*, 383 F.3d at 17 (holding the December 2002 Policy invalid because its interpretation of § 3621(b) was contrary to plain meaning of statute); *Elwood v. Jeter*, 386 F.3d 842 (8th Cir.2004) (same). District courts in this circuit were split, although the weight of authority also concluded that the December 2002 Policy was invalid. *See, e.g., Pinto v. Menifee*, 04 Civ. 5839, 2004 WL 3019760, at *4–*5 (S.D.N.Y. Dec.29, 2004) (collecting cases). The courts holding the December 2002 Policy invalid found fault with the policy under one or a combination of the following grounds: (1) the policy violated the APA notice and comment requirement, *see, e.g., Cato v. Menifee*, 03 Civ. 5797, 2003 WL 22725524, at *5 n. 1 (S.D.N.Y.· Nov.20, 2003); (2) the policy relied on an erroneous interpretation of §§ 3621(b) and 3624(c); *see, e.g., Zucker v. Menifee*, 03 Civ. 10077, 2004 WL 102779, at *6–*11 (S.D.N.Y. Jan.21, 2004); or (3) the policy violated the Ex Post Facto Clause, *see, e.g., Crowley v. Federal Bureau of Prisons*, 312 F.Supp.2d 453, 462–63 (S.D.N.Y.2004). In his petition, Moss challenges the December 2002 Policy on each of these grounds.

In response to the division among the district courts and criticism in the circuit courts concerning the December 2002 Policy, the BOP proposed, and ultimately adopted, a new policy pursuant to the APA's notice and comment procedures. *See* Community Confinement, 69 Fed.Reg. 51,213 (Aug. 18, 2004) ("Proposed Rule"); Community Confinement, 70 Fed.Reg. 1659 (Jan. 10, 2005) (effective date Feb 14, 2005) (the "February 2005 Policy").[3]

---

**3.** As codified, the policy provides:

§ 570.20 What is the purpose of this subpart?

(a) This subpart provides the Bureau of Prisons' (Bureau) categorical exercise of discretion for designating inmates to community confinement. The Bureau desig-

nates inmates to community confinement only as part of the pre-release custody and programming which will afford the prisoner a reasonable opportunity to adjust to and prepare for re-entry into the community.

(b) As discussed in this subpart, the term "community confinement" includes Com-

The February 2005 Policy is indistinguishable in its effect on prisoners from the December 2002 Policy. Its rationale, however, had completely changed. Where the December 2002 Policy interpreted §§ 3621(b) and 3624(c) in a manner that stripped the BOP of all discretion to place inmates in CCCs prior to the last ten percent of their sentences, not to exceed six months, the February 2005 Policy acknowledged that the BOP had discretion to place inmates in CCCs prior to the date specified in § 3624(c). The BOP asserted, however, that it could categorically exercise that discretion to decline to place inmates in CCCs before the last ten percent of their sentences, not to exceed six months, pursuant to the United States Supreme Court's decision in *Lopez v. Davis*, 531 U.S. 230, 121 S.Ct. 714, 148 L.Ed.2d 635 (2001), which held that the BOP could exercise discretion granted by another provision of § 3621 in part through the issuance of categorical rules. *See* February 2005 Policy, 70 Fed.Reg. at 1661.

Moss asserts, and the BOP does not contest, that pursuant to either the December 2002 Policy or the February 2005 Policy, he will not be eligible for transfer to a CCC until September 8, 2005, almost four months after he would have been

considered for transfer under the earlier BOP policy. (*See* Pet. at 2.)

## II. DISCUSSION

### A. MOSS'S CHALLENGE TO THE DECEMBER 2002 POLICY IS MOOT

 To the extent Moss seeks to challenge the application of the December 2002 Policy to his requested transfer to a CCC, that challenge is moot. The February 2005 Policy supercedes the December 2002 Policy. (*See* Respondent Mem. at 8; Proposed Rule, 69 Fed.Reg. at 21,213 (proposing new rule in response to challenges to the December 2002 Policy).) Consequently, the BOP's determinations concerning Moss's transfer request are not being made pursuant to the December 2002 Policy, and Moss can no longer assert that the application of the December 2002 Policy to his transfer request is affecting his rights.[4] *See Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477, 110 S.Ct. 1249, 108 L.Ed.2d 400 (1990) ("Article III denies federal courts the power 'to decide questions that cannot affect the rights of litigants in the case before them,' and confines them to resolving 'real and substantial controvers[ies] admitting of specific relief through a decree of a conclusive character,

munity Corrections Centers (CCC) (also known as "halfway houses") and home confinement.
§ 570.21 When will the Bureau designate inmates to community confinement?
(a) The Bureau will designate inmates to community confinement only as part of prerelease custody and programming, during the last ten percent of the prison sentence being served, not to exceed six months.
(b) We may exceed these time frames only when specific Bureau programs allow greater periods of community confinement, as provided by separate statutory authority (for example, residential substance abuse treatment program (18 U.S.C. 3621(e)(2)(A), or shock incarceration program (18 U.S.C. 4046(c)).

28 C.F.R. §§ 570.20–570.21 (2005). Because the BOP's justification for the policy is contained in the Federal Register, the Court will refer to the entire Federal Register entry in which the policy to be codified is contained as the February 2005 Policy.

4. Moss did not allege that he was improperly denied an initial placement in a CCC due to the December 2002 Policy, which was in effect at the time of his sentencing. Consequently, the Court does not decide whether Moss would be able to challenge his initial designation to FCI Otisville via habeas corpus, or whether any such challenge would also be moot.

as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.' ") (quoting *North Carolina v. Rice*, 404 U.S. 244, 246, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971)); *Princeton University v. Schmid*, 455 U.S. 100, 103, 102 S.Ct. 867, 70 L.Ed.2d 855 (1982) (per curiam) (holding that where a challenged regulation was superceded by a new regulation, "the issue of the validity of the old regulation is moot, for this case has 'lost its character as a present, live controversy of the kind that must exist if we are to avoid advisory opinions on abstract questions of law.' ") (quoting *Hall v. Beals*, 396 U.S. 45, 48, 90 S.Ct. 200, 24 L.Ed.2d 214 (1969) (per curiam)).

## B. *MOSS'S CHALLENGE TO THE FEBRUARY 2005 POLICY*

■ Notwithstanding that Moss's petition does not explicitly challenge the February 2005 Policy, the Court must construe a *pro se* petitioner's petition liberally. *See Fleming v. United States*, 146 F.3d 88, 90 (2d Cir.1998) (per curiam); *see also Levine*, 2005 WL 1384021, at *3 (construing a *pro se* petitioner's traverse as a request to amend petition to challenge the February 2005 Policy and granting such amendment); *Wiesel*, 2005 WL 1036297, at *4 (same). Thus, this Court considers Moss's petition as a challenge to the February 2005 Policy as well as the December 2002 Policy, especially since Moss's potential transfer to a CCC will be evaluated under the February 2005 Policy and since Moss's traverse makes clear that he also seeks to challenge the February 2005 Policy. (*See* Petitioner's Traverse in Reply to Respondent's Opposition to Petition for Writ of Habeas Corpus, dated June 7, 2005 ("Traverse").) The Court examines each of Moss's challenges as applied to the February 2005 Policy in turn.

### 1. *The Policy Complies with APA Requirements*

■ The APA generally requires a notice and comment procedure before an administrative agency, including the BOP, issues a new rule. *See* 5 U.S.C. § 553. A number of petitioners successfully challenged the December 2002 Policy in this district on the grounds that the December 2002 Policy did not satisfy the APA's notice and comment requirements. *See e.g., Crowley*, 312 F.Supp.2d at 457–58; *Cato*, 2003 WL 22725524, at *5 n. 1. *But see Cohn v. Federal Bureau of Prisons*, 302 F.Supp.2d 267, 274 (S.D.N.Y.2004) (holding that the December 2002 Policy was not subject to the APA's notice and comment requirements). However, the February 2005 policy was promulgated in compliance with the notice and comment rulemaking procedures required by the APA. *See* Proposed Rule, 69 Fed.Reg. at 51,213 (giving notice of and requesting comments on the proposed rule); February 2005 Policy, 70 Fed.Reg. at 1659 (responding to comments on proposed rule and adopting final rule); *see also Levine*, 2005 WL 1384021, at *3 n. 1 (finding implementation of February 2005 Policy to conform to APA procedures); *Wiesel*, 2005 WL 1036297, at *4 (same); *Pimentel*, 367 F.Supp.2d at 372 (same). No court has found the February 2005 Policy to violate the APA notice and comment requirements. Consequently, Moss cannot demonstrate that the February 2005 Policy fails to comply with these APA requirements.

### 2. *The Policy Reasonably Interprets § 3621(b)*

■ Moss's challenge to the BOP's interpretation of § 3621(b) adopted by the February 2005 Policy fails because the BOP has discretion to categorically limit the conditions under which inmates sentenced to a term of imprisonment may be

designated to serve all or part of their sentence in a CCC, subject to § 3624(c)'s requirement that the BOP, to the extent practicable, place inmates in CCCs for the last ten percent of their sentences, not to exceed six months. The Court agrees with the BOP that *Lopez* controls the Court's analysis of this issue.

In *Lopez*, the Supreme Court upheld a BOP policy that "categorically denies early release to prisoners whose current offense is a felony attended by 'the carrying, possession, or use of a firearm.'" 531 U.S. at 232–33, 121 S.Ct. 714 (quoting 28 C.F.R. § 550.58(a)(1)(vi)(B) (2000)). At issue in *Lopez* was 18 U.S.C. § 3621(e)(2)(B),[5] which contains an incentive provision that allows qualified prisoners to enjoy an earlier release after completion of a drug treatment program. In 1995, the BOP determined that because the reduction would be offered only to prisoners convicted of "nonviolent offenses," it could limit those eligible for early release by defining this category of offenses to exclude drug offenses that involved possession of a firearm. *Lopez*, 531 U.S. at 233–34, 121 S.Ct. 714. Prompted by a split among the circuit courts concerning the validity of this interpretation, the BOP promulgated a regulation in 1997 that did not purport to define the term "nonviolent offense," but rather, exercised the BOP's discretion under the statute to "categorically exclude[ ] [an inmate who possessed a firearm in connection with his offense] ... pursuant to the Bureau's asserted discretion to prescribe additional early release criteria." *Id.* at 235–36, 121 S.Ct. 714.

The Supreme Court held that the BOP's adoption of the rule reflected a reasonable interpretation of the statute and permissibly regulated the BOP's discretion under the statute through rulemaking. The Court first explained that the statute granted the BOP the authority, but not the duty, to alter nonviolent offenders' terms of imprisonment if they completed a drug treatment program, but did not regulate the conditions under which that authority should be exercised. Following doctrine established by *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843–45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) and subsequent cases, the Court concluded that the challenged regulation "filled the statutory gap [left by Congress's decision to not regulate the conditions under which the BOP's early release authority should be exercised] 'in a way that is reasonable in light of the legislature's revealed design.'" *Lopez*, 531 U.S. at 242, 121 S.Ct. 714 (quoting *NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 257, 115 S.Ct. 810, 130 L.Ed.2d 740 (1995)).

Next, the Court concluded that the BOP could regulate its discretion under the statute through the adoption of categorical rules. Noting that "'even if a statutory scheme requires individualized determinations, ... the decisionmaker has the authority to rely on rulemaking to resolve certain issues of general applicability unless Congress clearly expresses an intent to withhold that authority,'" *Lopez*, 531 U.S. at 243–44, 121 S.Ct. 714 (quoting *American Hospital Assn. v. NLRB*, 499 U.S. 606, 612, 111 S.Ct. 1539, 113 L.Ed.2d 675 (1991)), the Court concluded that the BOP's resort to rulemaking was permissible in that case. Nothing in the statute restricted the BOP's authority to regulate its discretion through rulemaking. Moreover, according to the Court, requiring

---

**5.** The statute provides: "The period a prisoner convicted of a nonviolent offense remains in custody after successfully completing a treatment program may be reduced by the Bureau of Prisons, but such reduction may not be more than one year from the term the prisoner must otherwise serve." 18 U.S.C. § 3621(e)(2)(B).

case-by-case decisionmaking "could invite favoritism, disunity, and inconsistency." *Lopez,* 531 U.S. at 244, 121 S.Ct. 714.

The policy upheld by the Supreme Court in *Lopez* is indistinguishable in all material respects from the one at issue in this case. Just as in *Lopez,* where the BOP responded to challenges to the policy's validity by regulating its own discretion in a manner consistent with its policy objectives, the BOP responded in this case to challenges to the December 2002 Policy by electing to regulate its discretion in a manner that achieved the same goals as the December 2002 Policy. Also as in *Lopez,* the challenged regulation rests on the BOP's asserted right to regulate the considerable discretion granted to it by Congress. *See* 18 U.S.C. § 3621(b) ("The Bureau may designate any available penal or correctional facility that meets minimum standards of health and habitability established by the Bureau.... The Bureau may at any time ... direct the transfer of a prisoner from one penal or correctional facility to another."). Thus, as dictated by *Lopez,* the February 2005 Policy should pass muster if: 1) the policy does not reflect an unreasonable interpretation of § 3621(b); and 2) Congress did not "clearly express[ ] an intent to withhold [the BOP's] authority" to regulate its discretion under § 3621(b) through adoption of categorical rules. *Lopez,* 531 U.S. at 244, 121 S.Ct. 714 (quoting *American Hospital Assn.,* 499 U.S. at 612, 111 S.Ct. 1539).

An examination of § 3621(b) and the BOP's statements concerning the February 2005 Policy confirms that the BOP's interpretation of the relevant statute is reasonable in this case. Congress, in § 3621(b), explicitly delegated discretion to the BOP to "designat[e] the place of imprisonment or mak[e] transfers." 18 U.S.C. § 3621(b). The BOP is given the authority under the statute to "designate any available penal or correctional facili-

*ty* that meets minimum standards of health and habitability established by the Bureau ... *that the Bureau determines* to be appropriate and suitable." *Id.* (emphasis added); *see also Goldings,* 383 F.3d at 25 (finding that § 3621(b) "grants the BOP discretionary authority to choose [a prisoner's] place of imprisonment from among 'any' available penal or correctional institution," including CCCs). In making any such initial placement determinations or transfers pursuant to § 3621(b), the statute sets out five factors for the BOP to consider. *See* 18 U.S.C. §§ 3621(b)(1)-(5).

The BOP has unequivocally stated that it has considered each of these five statutory factors, as well as other pertinent considerations, when developing the February 2005 Policy. *See* Proposed Rule, 69 Fed. Reg. at 51,214 ("In deciding to limit inmates' community confinement to the last ten percent of the prison sentence, not to exceed six months, the Bureau has carefully considered all of the statutorily-specified factors, as well as the additional considerations that it identified as pertinent."). Moreover, although the policy restricts inmates' access to CCCs, it also explicitly states that the BOP will continue to consider all five statutory factors when designating or transferring inmates to correctional facilities. *See* February 2005 Policy, 70 Fed.Reg. at 1660 ("The Bureau will continue to evaluate [the factors set forth in Section 3621(b) ] when making individual designations to appropriate Bureau facilities, and this rule will not adversely affect such individualized determinations.").

The Court sees no reason to doubt the veracity of these statements. Consequently, it disagrees with the conclusions reached in *Drew* and *Wiesel* that the BOP considered at most two of the § 3621(b) factors when developing the February 2005 Policy. *Drew* contends that the Fe-

burary 14 Policy "does not consider any of the [§ 3621(b)] factors that the BOP, in the words of the Senate Committee on the Judiciary, 'is specifically required' to consider" when making facility designation determinations. *Drew*, 2005 WL 525449, at *4. Based on its reading of the legislative history of § 3621(b), *Drew* concludes that the regulation neglects the § 3621(b) factors unreasonably, and that it therefore must fail. *Wiesel* contends that the commentaries to the proposed and final versions of the February 2005 Policy "specifically discuss only two [§ 3621(b)] factors," *Weisel v. Menifee*, 2005 WL 1036297, at *6 (S.D.N.Y.2005), but nonetheless concludes based on its reading of the legislative history that the BOP may ignore certain of the § 3621(b) factors when making facility designation decisions. *Id.* at *7.

But the Court does not read the BOP's commentary as asserting its right to ignore certain of the § 3621(b) factors when making policy, particularly in light of the statement, quoted above, that it has "carefully considered all of the statutorily-specified factors" in developing the February 2005 Policy. Rather, the BOP's commentary asserts that it viewed several considerations, including two of the factors enumerated in § 3621(b)—the requirement that BOP consider facility resources when making designation determinations, pursuant to § 3621(b)(1), and the requirement that the BOP consider policy statements issued by the Sentencing Commission, pursuant to § 3621(b)(5)—"as *most significant*" in its decisionmaking process. Proposed Rule, 69 Fed.Reg. at 51,214 (emphasis added). Nothing in § 3621(b) regulates the weight that the BOP must give to each of the factors enumerated by the statute, even if the statute were read to require BOP to give at least *some* consideration to each factor. *Cf. Lopez*, 531 U.S. at 242, 121 S.Ct. 714 (determining that the BOP could weigh preconviction conduct heavily

in determining eligibility for an early release program). Moreover, nothing in the statute prohibits the BOP from relying on "additional considerations" that it identified as pertinent when it developed the February 2005 Policy. *See* Proposed Rule, 69 Fed.Reg. at 51,214. Some of these additional considerations, such as the BOP's stated desire to avoid favoritism in making designation decisions, *see id.*, are specifically referenced by the statute, and thus cannot serve as the basis for concluding that the policy's interpretation of the statute is unreasonable. *See* § 3621(b) ("[T]here shall be no favoritism given to prisoners of high social or economic status."). Others, including the BOP's assertion that the perceived leniency of designations or early transfers to CCCs may "reduce the deterrent effect of imprisonment sentences," and "could affect a potential offender's calculus of the costs and benefits of committing a crime," Proposed Rule, 69 Fed. Reg. at 51,214–15, reflect contestable, but not unreasonable, policy positions.

Because the Court concludes that the February 2005 Policy represents a reasonable interpretation of § 3621(b), it does not need to consider whose reading of § 3621(b)'s legislative history is "correct," or whether any hypothetical BOP policy that asserted the right to ignore, for example, "the history and characteristics of the prisoner," § 3621(b)(2), or "any statement by the court that imposed the sentence," § 3621(b)(4), when making facility designations, would pass muster under *Chevron.*

The Court also concludes that Congress did not clearly express an intent to withhold the BOP's authority to regulate its discretion under § 3621(b) through the adoption of categorical rules such as the February 2005 Policy. *See Lopez*, 531 U.S. at 244, 121 S.Ct. 714. Nothing in § 3621(b) explicitly prohibits the BOP

from regulating its discretion under that statutory provision in part through the issuance of categorical rules. Consequently, the Court finds that the February 2005 Policy represents a lawful exercise of the BOP's discretion under § 3621(b), and that Moss's challenge based on the February 2005 Policy's interpretation of the statute must fail.

### 3. *The Policy Does Not Violate the Ex Post Facto Clause*

 The Court agrees with *Levine* that neither the December 2002 Policy nor the February 2005 Policy violates the Ex Post Facto Clause, even assuming that Moss could claim the protection of the Clause based on the timing of his criminal conduct, plea, and sentencing.[6] *See Levine*, 2005 WL 1384021, at *6–*9. It adopts that decision's well-reasoned Ex Post Facto analysis, concluding with *Levine* that the Second Circuit's decision in *Lee v. Governor of the State of New York*, 87 F.3d 55 (2d Cir.1996), is controlling. In that case, the Second Circuit concluded that a state statute and executive order retroactively restricting certain prisoners' access to temporary release programs "does not constitute an increase in punishment. Their evident purpose is not to add punishment, but rather to serve the regulatory purpose of limiting early community

contact for those in the designated felony categories." *Id.* at 59. As described above, the BOP policies challenged in this suit are also intended, at least in relevant part, to "serve the regulatory purpose of limiting early community contact" for those sentenced to terms of imprisonment, rather than to enhance the punishment associated with individual crimes. Consequently, the policies "fall[ ] on the lawful side of the ex post facto line." *Id.*

### III. *ORDER*

For the foregoing reasons, it is hereby

**ORDERED** that the petition of Stephen Moss ("Moss") for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 is DENIED.

The Clerk of Court is directed to close this case.

**SO ORDERED.**

---

6. According to Moss's J & C, his criminal conduct occurred before the enactment of the December 2002 Policy, while his plea and sentencing both occurred after that policy was enacted. If the operative date for Ex Post Facto purposes were the date of plea, conviction, or sentencing, therefore, the policies' adoption could not present a constitutional question as applied to Moss, because the December 2002 Policy had already been instituted at the time of his plea and the February 2005 Policy did not have any different effect on Moss than the December 2002 Policy. But while the policies underlying the Ex Post Facto Clause may be most directly implicated when punishment is increased after the date of plea or sentencing because "a prisoner's eligibility for reduced imprisonment is a significant factor entering into both the defendant's decision to plea bargain and the judge's calculation of the sentence to be imposed," *Weaver v. Graham*, 450 U.S. 24, 32, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981), the Supreme Court has also indicated that the only relevant "timing" question is whether the defendant's crime was committed before the allegedly punitive statute's enactment. *See id.* at 25, 101 S.Ct. 960 (asking whether a statute violated the Ex Post Facto Clause when applied to a defendant "whose crime was committed before the statute's enactment").